1

2   LOCKE LORD LLP
    MICHAEL F. PERLIS (095992)
3   mperlis@lockelord.com
    CARY J. ECONOMOU (211438)
4   ceconomou@lockelord.com
    F. PHILLIP HOSP (265225)
5   phosp@lockelord.com
    300 South Grand Avenue, Suite 2600
6   Los Angeles, CA 90071
    Telephone: 213-485-1500
7   Facsimile: 213-485-1200

8

9   Attorneys for Plaintiff
    MOTORCAR PARTS OF AMERICA, INC.
10

11

FILED
CLERK, U.S. DISTRICT COURT

FEB 1 3 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOTORCAR PARTS OF AMERICA, INC., a New York corporation,<br><br>                    Plaintiff,<br><br>            vs.<br><br>FAPL HOLDINGS INC., a Canadian corporation, JACK SHUSTER, an individual, GORDON FENWICK, an individual, PAUL FENWICK, an individual, and JOEL FENWICK, an individual,<br><br>                    Defendants. | CASE NO. CV14 - 1153 VBK<br><br>COMPLAINT FOR:<br>1. **BREACH OF CONTRACT;**<br>2. **NEGLIGENT MISREPRESENTATION;**<br>3. **COMMON LAW FRAUD;**<br>4. **VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5; AND**<br>5. **VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT.**<br><br>[JURY TRIAL DEMANDED] |

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

**INTRODUCTION**

1. Plaintiff Motorcar Parts of America, Inc. ("MPA" or "Plaintiff") brings this action against FAPL Holdings Inc. ("FAPL"), Jack Shuster, Gordon Fenwick, Paul Fenwick, and Joel Fenwick (collectively, "Defendants") based on their egregious misconduct in connection with the sale of the outstanding capital stock of Fenwick Automotive Products Ltd. ("Fenwick Auto"), its affiliate, Introcan Inc., and their subsidiaries (collectively, "Fenco") to MPA.

2. The parties memorialized their agreement with respect to the purchase of Fenco's capital stock in a written purchase agreement ("Purchase Agreement"), a copy of which is attached hereto as **Exhibit A**. As consideration for Fenco's capital stock, MPA issued 360,000 shares of its common stock to FAPL. As part of this sale of stock, the Defendants misrepresented and concealed material facts concerning outstanding liabilities and customer discounts in Fenco's financial statements, among other things. As a result of these material misrepresentations and omissions, the Defendants breached their obligations to MPA under the Purchase Agreement and violated, *inter alia*, federal securities laws and Canadian law.

3. Because of the Defendants' deceitful conduct, significant liabilities were concealed from MPA. Had MPA known about these liabilities, it would not have agreed to pay the price it did for Fenco's stock or agreed to discharge and release pre-existing security interests against Fenco property, which were received in connection with previous loans by MPA to Fenwick Auto.

**THE PARTIES**

4. MPA is a New York corporation with its principal place of business located in Los Angeles County at 2929 California Street, Torrance, California 90503. At all relevant times, shares of MPA's common stock were listed on the NASDAQ Stock Market and publicly traded under the ticker symbol "MPAA."

5. Defendant FAPL is a Canadian corporation with its principal place of business located at 1100 Caledonia Road, City of Toronto, Province of Ontario M6A

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1

1   2W5, Canada.  Prior to May 6, 2011, FAPL was the holding company of Fenwick

2   Auto and its various operating entities and associated real estate companies, Introcan

3   Inc. and Fapco, S.A. de C.V.

4       6.      Defendant Jack Shuster is a Canadian citizen who resides in the City of

5   Toronto, Province of Ontario, Canada.  For all relevant time periods, he was a

6   controlling principal of FAPL, acting as president and CEO of Fenwick Auto,

7   Introcan Inc., Rafko Holdings Inc., LH Distribution Inc., Rafko Enterprises Inc., and

8   Flo-Pro Inc.

9       7.      Defendant Gordon Fenwick is a Canadian citizen who resides in the City

10  of Toronto, Province of Ontario, Canada.  For all relevant time periods, he was a

11  controlling principal of FAPL, acting as president and CEO of Autocat Catalogue

12  Services Inc., 778355 Ontario Inc., and FAPCO, S.A. de C.V.

13      8.      Defendant Paul Fenwick is a Canadian citizen who resides in the City of

14  Toronto, Province of Ontario, Canada.  At all relevant times, Paul Fenwick was a

15  controlling principal of FAPL, acting as a director, vice-president and treasurer of

16  Fenwick Auto.

17      9.      Defendant Joel Fenwick is a Canadian citizen who resides in the City of

18  Toronto, Province of Ontario, Canada.  At all relevant times, Joel Fenwick was a

19  controlling principal of FAPL, acting as a director, vice-president and secretary of

20  Fenwick Auto.

21      10.     Defendants Jack Shuster, Gordon Fenwick, Paul Fenwick, and Joel

22  Fenwick are collectively referred to below as the "Principals."

23                      **JURISDICTION AND VENUE**

24      11.     The claims alleged herein arise under Sections 10(b) and 20(a) of the

25  Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j and 78t], and

26  Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].  As the parties acknowledged in

27  Section 6(f) of the Purchase Agreement, MPA's common stock "is a class of securities

28  listed on the NASDAQ Global Market as of the date of this Agreement."

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1    Furthermore, as alleged below, the sale of MPA's stock was a domestic transaction in

2    that title to such shares was transferred within the United States.

3         12.    The Court has jurisdiction over MPA's federal securities law claims

4    pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  The Defendants'

5    conduct had a direct and foreseeable result within the United States.  The Defendants

6    made the material misrepresentations and omissions in financial statements with the

7    knowledge that shares of MPA's common stock were listed on a U.S. stock exchange

8    and that MPA would be reporting the information according to its obligations under

9    U.S. securities laws.

10        13.    This Court has supplemental jurisdiction over MPA's breach of contract,

11   negligent misrepresentation and fraud claims pursuant to 28 U.S.C. § 1367 because

12   they are so related to the federal claims that they form a part of the same case or

13   controversy under Article III of the United States Constitution.

14        14.    The Court also has jurisdiction pursuant to 28 U.S.C. § 1332 from the

15   complete diversity between the parties and the fact that the amount of damages sought

16   by MPA exceeds the jurisdictional minimum of this Court.

17        15.    Venue is proper pursuant to Section 22 of the 1933 Act [15 U.S.C. § 77v]

18   because the agreements upon which this action is based were executed in Los

19   Angeles, where MPA is headquartered, and certain obligations under those

20   agreements were performed in Los Angeles.  Although the Purchase Agreement is to

21   be interpreted under the laws of Canada, the parties agreed in Section 24 of the

22   agreement that jurisdiction in Ontario courts was "non-exclusive," thereby authorizing

23   the parties to commence an action in any other appropriate forum or jurisdiction.

## GENERAL ALLEGATIONS

### I.    THE REMANUFACTURED AUTO PARTS INDUSTRY.

26        16.    Automotive parts fall under two different categories, original equipment

27   parts and aftermarket parts.  Original equipment parts are new parts that are used in

28   the assembly of new motor vehicles or are purchased by the manufacturer for its

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

service network.  Aftermarket parts are used to replace original equipment parts as they become worn or damaged.  They can be new or remanufactured.

17.    Remanufacturing is the process of restoring non-functioning, discarded, or traded-in parts ("cores") to like-new performance.  The process provides a number of benefits to the automotive market.  It makes products more broadly available at lower prices reducing the capital investment required for plant and equipment.  It also conserves raw materials and energy required to produce automotive parts from scratch.

18.    MPA is North America's largest remanufacturer of alternators and starters for import and domestic cars, light trucks, heavy duty, agricultural and industrial equipment.  MPA has remanufacturing, warehousing, and shipping / receiving operations in Mexico, California, Singapore, and Malaysia.  Through this network, MPA distributes its products to large retail chain outlets, which sell the products to individual consumers.  It also distributes products to professional installers, traditional warehouse distributors, and automotive dealer networks.

19.    At the time of the acquisition, Fenco also manufactured and distributed remanufactured aftermarket products in North America and had various subsidiaries in Canada, the United States, and Mexico.  Fenco's product line included master cylinders, brake calipers, steering gears, steering pumps, CV drive shafts, and rack and pinion products, and clutch systems, hub and wheel bearings, water pumps, control arms, and struts.  Its distribution network included two primary receiving and distribution centers in Pennsylvania and third-party operated warehouses located in California.

20.    Used cores are the key ingredient in the remanufacturing process.  They are parts installed by the vehicle manufacturer that are subsequently removed for replacement.  Each used core contains salvageable parts that are an important raw material in the remanufacturing process.

21.     Remanufacturers obtain most used cores by providing credits to their customers for used cores returned under the core exchange program.  They encourage their customers to return used cores by initially charging a core charge on top of the price of the remanufactured part.  However, the core charge is credited back to a customer's open invoices when a used core is returned.

22.     When a remanufacturer receives used cores from customers or core brokers, the parts are evaluated for inventory control purposes and then sorted by part number.  Each part is completely disassembled into its fundamental components and cleaned.  All components known to be subject to major wear and determined not to be reusable or repairable are replaced by new components.  Non-salvageable components of each part are sold as scrap.

23.     Competitive pressures in the auto parts remanufacturing industry are heavily influenced by a select group of large customers (e.g., NAPA, Advance Auto Parts, AutoZone) because they account for a large percentage of a remanufacturer's customer base.  Reductions in the level of sales to large customers or the loss of one account can substantially affect the profitability of an auto parts remanufacturer.  As a result, remanufacturers try to negotiate long-term written agreements with large customers in exchange for certain exclusivity rights.

24.     Customer agreements in the industry differ from contract to contract, but typically include customer incentives that would be relevant when evaluating profitability.  Customer incentives could include such things as price reductions, marketing allowances, and more favorable delivery and payment terms.  Therefore, the terms of a remanufacturer's customer agreements should be utilized to account accurately for net profits under U.S. and Canadian generally accepted accounting principles ("GAAP").

## II.    MPA'S SECURED LOANS TO FENCO.

25.     In 2009, Fenco started to experience liquidity issues that caused it to run afoul of various financial covenants in its loan agreement with its lender.  To address

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

these issues and sustain the company's business operations, the Principals aggressively pursued alternative financing options and, in doing so, engaged in the deceptive practices to attract MPA as a potential investor. On numerous occasions, the Principals travelled to Los Angeles to solicit potential business and capital raising opportunities with MPA. The Principals also travelled to Los Angeles to attend MPA's planning meetings.

26.     On August 24, 2010, MPA entered into an agreement ("Debenture") to loan Fenwick Auto $1,894,034.09. The loan was secured by a blanket lien on all of Fenco's assets. In addition, MPA was granted an option to purchase treasury shares of FAPL or any other Fenco entity.

27.     On December 15, 2010, MPA made an additional loan in the amount of approximately $2,969,000 to Fenwick Auto pursuant to an amended and restated debenture ("Amended Debenture"), bringing the total aggregate loan amount to approximately $4,863,000. In connection with the Amended Debenture, MPA was granted an amended option to purchase treasury shares representing 80% of the common stock of FAPL.

28.     In addition to the loans, the Principals asked MPA to provide additional inventory on credit to Fenco, which it did. Prior to the acquisition, the outstanding credits totaled $4,863,000. Ultimately, this amount reached $27,382,000 and was never repaid.

**III.    THE PURCHASE AGREEMENT.**

29.     On May 6, 2011, MPA purchased the outstanding capital stock of Fenco, in exchange for which MPA agreed to issue 360,000 shares of its common stock to FAPL. In conjunction with the acquisition, the parties executed a hold agreement ("Hold Agreement"), pursuant to which the shares issued by MPA were subject to transfer restrictions during a period of eighteen months commencing on May 6, 2011 and ending November 6, 2012 ("Hold Period"). The parties also executed and entered into an escrow agreement ("Escrow Agreement"), pursuant to which the shares were

1  held in escrow to cover claims for indemnification.  Copies of the Hold and Escrow

2  Agreements are attached hereto as Exhibits B & C, respectively.

3       30.  In acquiring Fenco's stock, MPA relied on financial statements reviewed

4  or audited by BDO Canada LLP ("BDO"), specifically the (1) the audited

5  consolidated financial statements of FAPL and the notes thereto for the fiscal year

6  ended on March 31, 2010, and (2) the reviewed consolidated financial statements of

7  FAPL for the nine month period ended on December 31, 2010 (collectively, "Pre-

8  Acquisition Financial Statements").  The summaries of accounting policies contained

9  in those financial statements stated the following:

10      **1.**  **Basis of Accounting:** Fenco's financial statements were prepared in

11          accordance with Canadian GAAP;

12      **2.**  **Revenue Recognition:** Fenco's revenue was net of discounts, rebates,

13          and allowances;

14      **3.**  **Inventories:**  Cost of finished goods included raw materials, labor, and

15          factory overhead; and

16      **4.**  **Reconciliation to United States GAAP:** Fenco's financial statements

17          were "prepared in accordance with Canadian GAAP, which conforms, in

18          all material respects, with [U.S. GAAP]."

19       31.  In addition to the Pre-Acquisition Financial Statements, MPA also relied

20  on a series of representations and warranties contained in the Purchase Agreement

21  that, among other things, confirmed the accuracy of the information that MPA had

22  been provided during the due diligence period.

23       32.  In Section 5(o), FAPL represented and warranted that:

24      The Subsidiaries are not a party to nor are they bound by any contract,

25      agreement or commitment that materially adversely affects or could
    reasonably be expected to materially adversely affect the Subsidiaries'

26      businesses or financial condition or any of their respective assets.

27      Additionally, since March 31, 2010, none of the Subsidiaries has:

28                    *     *     *

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

COMPLAINT

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

(ii)   incurred, assumed or become subject to any material liability except in the ordinary course of business....

*   *   *

(vi)   except as described in [FAPL's] financial statements, made any change in its accounting principles and practices as theretofore applied including, without limitation, the basis upon which its assets and liabilities are recorded on its books and its earnings, profits and losses are ascertained.

33.   In Section 5(r), FAPL represented and warranted that:

**Financial Matters.**   The audited consolidated financial statements of [FAPL] and notes thereto as at and for the year ended March 31, 2010 and the unaudited 9 month period ended December 31, 2010, present fairly in all material respects the consolidated financial position of the Subsidiaries as at the dates indicated and the results of the operations and changes in financial position for the periods specified and reflect all material liabilities (absolute, accrued, contingent or otherwise) of the Subsidiaries (on a consolidated basis) as of the dates thereof and such financial statements have been prepared in conformity with GAAP applied, except as otherwise state therein, on a consistent basis.

34.   In Section 5(w)(i), FAPL represented and warranted that:

To the best of [FAPL's] knowledge and belief, the Subsidiaries are conducting their business in compliance with all applicable laws, regulations, by-laws and ordinances of each jurisdiction in which their business is carries on, except where the failure to be in such compliance would not have a material adverse effect on Subsidiaries....

35.   In Section 5(x), FAPL represented and warranted that:

**Material Facts Disclosed.**   None of the statements, documents, certificates or other items prepared or supplied by [FAPL] or the Subsidiaries to the Purchaser with respect to the transactions contemplated hereby contains any untrue statement of a material fact, or failed to disclose a fact that was necessary to be made in order for any material statement not to be misleading at the time it was provided.

36.   In Section 11 of the Purchase Agreement, FAPL, jointly and severally with the Principals, agreed to indemnify MPA and pay for any damages arising out of

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

the "any breach or inaccuracy of any representation or warranty given by [FAPL] contained in this Agreement" and "any liability (in excess of any insurance payments) relating to any product manufactured, constructed, installed, shipped, distributed, sold or provided by any of the Subsidiaries prior to the Closing Date, including any product liability or product warranty whether the damages in respect of such products are suffered before or after the Closing…."

37.   Section 13 limited the Defendants' indemnification obligations under the Purchase Agreement to a maximum of $4 million for FAPL and $250,000 for each of the Principals.   However, Section 13 also stated that "Nothing in this Agreement, including this Section 13, limits or restricts in any way any remedies available, or damages payable, for claims involving fraud or fraudulent misrepresentation."

38.   Relying on FAPL's representations and warranties, MPA also agreed to loan Fenco an additional $10,000,000, bringing the aggregate amount of indebtedness owed by Fenco to $14,863,000.   The loan was discussed in MPA's Form 10-Q filed with the SEC on August 15, 2011.   Copies of the Purchase Agreement and the Pre-Acquisition Financial Statements were attached to the July 22, 2011 Form 8-K/A that MPA filed with the SEC.

## IV.   BDO'S POST-ACQUISITION AUDIT OF FENCO.

39.   Following the acquisition, Fenco continued to operate independently as a separately capitalized subsidiary of MPA, with the Principals maintaining their respective roles in managing the day to day business of the company.

40.   In September 2011, BDO finalized its audit of Fenco's financial statements for the fiscal year ended on March 31, 2011 ("Post-Acquisition Financial Statements").   The losses reported in those statements were materially different than the numbers reported in the audited consolidated financial statements of FAPL and the notes thereto for the fiscal year ended on March 31, 2010.

41.   For example, with respect to the audited balance sheet, Fenco's deferred tax assets were valued at $3,440,000 in FY 2010.   In FY 2011, those assets were

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

valued at $0 due to the fact that Fenco would not realistically collect on growing net operating loss carry forwards.  Accounts receivable in FY 2011 also declined by 24.8% – from $30,893,000 in FY 2010 to $23,222,000 in FY 2011.   Moreover, Fenco's accounts payable and accrued liabilities increased over 33% – from $66,835,000 in FY 2010 to $89,418,000 in FY 2011.

42.    With respect to the audited statement of operations, Fenco's cost of sales in FY 2011 increased sharply by 28% – from $144,254,000 in 2010 to $184,739,000 in FY 2011.  Fenco's gross margin in FY 2011 declined even further by 45% – from $37,938,000 in 2010 to $20,994,000 in FY 2011.  With expenses, Fenco's loss (before other items) increased over 3,758% – from $602,000 in FY 2010 to $23,228,000 in FY 2011.

43.    With respect to cash flow, Fenco's calculated net cash outflow in FY 2011 increased by 296% – from $8,509,000 in FY 2010 to $33,770,000 in FY 2011. Included in this difference are significant changes to Fenco's non-cash working capital balances.  For example, its non-cash working capital for inventory decreased in FY 2011 by 3,016% – from a loss of $548,000 in FY 2010 to a much larger loss of $17,081,000 in FY 2011.

44.    In submitting the Post-Acquisition Financial Statements to MPA, the Principals knew that MPA had reporting obligations under federal securities laws and that Fenco's financial statements would be disclosed to the investing public.  Yet, they failed to provide any explanation or clarification in the notes or the summaries of accounting policies and, unbeknownst to MPA, continued in their efforts to conceal the truth about Fenco's true financial position.

45.    As a result of the concealment, the Defendants' intent to deceive, manipulate, and defraud MPA was not discovered until after MPA reviewed internal correspondence from the Principals' corporate email accounts in July 2012.

## V.    MPA DISCOVERS FENCO'S MISREPRESENTATIONS.

46.    The losses contained in BDO's audit of the Post-Acquisition Financial Statements spurred an extensive internal review and analysis of Fenco's accounting methods and internal procedures.  During the review, MPA discovered that many of the representations and warranties in the Purchase Agreement were untrue when made and that the Defendants either knew that they were untrue or made those representations (or caused those representations to be made) with a conscious disregard for their truth.

47.    Specifically, MPA discovered that the Principals (1) inflated Fenco's revenue by using a full core valuation method without properly recording the full extent of future core returns, (2) directed customers not to return cores until after the acquisition so that liabilities would not be reflected in the financial statements, and (3) failed to account for numerous customer rebates and allowances that had not been posted to the customers' accounts receivable sub-ledger or the accruals for contractual rebates and allowances due to the customers.

### A.    Outstanding Core Liabilities.

48.    With respect to outstanding liabilities, FAPL and the Principals misrepresented Fenco's income by concealing millions of dollars of outstanding core liabilities and refusing to accept used core returns from customers until after the acquisition.  In each transaction, Fenco charged a specific core charge when it sold remanufactured parts to its customers and was required to issue an offsetting credit when the cores were returned.  Contrary to its stated accounting methodology, Fenco did not account for all used cores that were received from its customers.  Instead, the Principals manipulated the accruals to satisfy debt covenants and to attract potential investors – like MPA – with inflated product margins and an increased cash position.

49.    Internal communications demonstrate that the Principals knew that accruing for all returned cores would adversely affect the company's cash flow and they employed a variety of tactics to inflate Fenco's financial position.  In some

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1  instances, the Principals would ask customers to postpone scheduled debits.   For

2  example, on September 28, 2010, Gordon Fenwick asked Advance Auto to "push out

3  the dates of the Core Return debits by 60 days for a while, until the cash flow

4  improves."

5      50.   In other instances, the Principals delayed the sorting process so that the

6  credits would not be processed internally.   For example, in January 2011, Duilia

7  Pomazanskyj, Fenco's accounts receivable manager, advised Gordon Fenwick and

8  Gino Trigiani, Fenco's Chief Financial Officer, that Fenco was 8-10 weeks behind in

9  credits, owing approximately $12 million.

10      **B.**   **Undisclosed Discounts.**

11      51.   Contrary to applicable accounting principles, the Defendants also failed

12  to accrue for significant customer discounts that were not reflected in the customer

13  agreements on file.

14      52.   For example, after the acquisition, MPA learned that the Defendants did

15  not accrue at least $1 million in retroactive discounts and rebates for products sold to

16  NAPA Auto Parts, one of Fenco's four largest customers.   This discount was not

17  represented in the financial reports provided to MPA or in any existing customer

18  agreements.

19      **C.**   **Undisclosed Fill Rate Issues.**

20      53.   The Principals also overstated Fenco's revenue by concealing the effect

21  of Fenco's substandard fill rates. "Fill rate" is a performance metric that reflects a

22  company's ability to ship the quantity of a specific order.   In the remanufacturing

23  industry, customers typically assess penalties when a remanufacturer fails to fill the

24  customer's purchase orders to a certain level.

25      54.   In this case, MPA discovered that financial policies and procedures

26  employed at Fenco did not provide for effective oversight and review of the

27  reconciliation of accounts at month or quarter ends.   Specifically, the financial

28  statements did not include substantial inventory and accounts payable amounts that

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

COMPLAINT

1   were due to vendors.   Fenco also incurred $1,935,040 in fill rate penalties in

2   connection orders placed throughout the fiscal year.

3       55.   In addition, the Principals misrepresented Fenco's financial condition by

4   using a target fill rate of 95% to calculate Fenco's net sales.  The Principals knew that

5   Fenco's actual fill rates were much lower.  For example, in an email to the Principals

6   dated October 7, 2010, Gordon Fenwick stated "I stand behind my statement made at

7   the management meeting 3 weeks ago, where I stated we are losing $5MM per month

8   in Sales Revenue due to Fill Rate issues."

9   **VI.   MPA REVISES ITS INITIAL ESTIMATE OF FENCO'S FAIR VALUE.**

10      56.   Relying on the representations and warranties contained in the Purchase

11  Agreement, MPA initially calculated that Fenco's assets and liabilities had a fair

12  market value of $544,000 at the time of the acquisition.   However, during its

13  subsequent review of Fenco's internal controls and accounting procedures, MPA

14  discovered facts and circumstances that existed as of the acquisition date that, if

15  known, would have affected the measurement of the amounts recognized as of that

16  date.

17      57.   In accordance with Accounting Standards Codification 805, MPA

18  subsequently revised its initial estimate of Fenco's fair value on two occasions -- in its

19  March 7, 2012 Form 10-Q and its September 28, 2012 Form 10-K.  In its most recent

20  revision, MPA estimated that the fair value of net assets acquired was ($63,410,000).

21  In other words, based on facts uncovered after the acquisition, the estimated fair value

22  of Fenco's net assets was actually $63,954,000 **less** than what MPA had initially

23  calculated by relying on the Defendants' financial statements and misrepresentations.

24      58.   The changes in fair value were primarily the result of revisions to the

25  valuation of inventory, including long-term core inventory, the customer core returns

26

27

28

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1   accrual, and the further assessment of cores on hand at the date of acquisition.[1]   In

2   addition, the valuation of intangible assets was also finalized based on the various

3   changes resulting in a reduction of the provisional values assigned to trademarks and

4   customer contracts, and an increase in the value assigned to non-compete agreements.

5       59.   After the acquisition, MPA was forced to invest additional funds into

6   Fenco to turn around the business.  Ultimately, however, the damages caused by the

7   Defendants' mismanagement and fraudulent business practices proved too much to

8   overcome as Fenco's revenues were insufficient to meet its operating expenses.  On

9   June 10, 2013, the Fenco entities filed voluntary petitions for relief under Chapter 7 of

10  the United States Bankruptcy Code.

11  **VII.   THE DEFENDANTS REFUSE TO INDEMNIFY MPA.**

12      60.   As a result of the damages caused by the misrepresentations discussed

13  above, MPA timely tendered a notice of Direct Claims against FAPL and the

14  Principals by letter dated October 31, 2012.

15      61.   By letters dated January 23, 2013, FAPL and the Principals disputed the

16  validity and amount of the Direct Claims.  As a result, the parties participated in a

17  non-binding mediation, in which they were unable to resolve the dispute at the

18  mediation.

19      62.   Following the mediation, the parties continued to discuss settlement.

20  They also entered into a tolling agreement ("Tolling Agreement"), according to which

21  they agreed that the running of any statute of limitations, laches period, or any other

22  period relating to the Direct Claims shall be tolled from July 29, 2013 until December

23  1, 2013.

[1] Long-term core inventory generally refers to the following: (i) Used cores purchased from core brokers and held in inventory; (ii) Used cores returned by customers and held in inventory at our facilities, (iii) Used cores returned by end-users to customers, (iv) Remanufactured cores held in finished goods inventory; and (v) Remanufactured cores held at customer locations as a part of the finished goods sold to the customer.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

63.    Counsel for the Principals subsequently executed a valid amendment to the Tolling Agreement on February 10, 2014 that continued to toll the limitations period through February 28, 2014.    After FAPL's counsel declined to sign the amendment, the Principals attempted to repudiate the binding amendment.

## FIRST CAUSE OF ACTION

### Breach of Contract

(Against the Defendants)

64.    MPA repeats and realleges each and every allegation contained above as if fully set forth herein.

65.    The Purchase Agreement is a valid and enforceable contract, according to which the Defendants incurred contractual obligations in connection with various representations and warranties.  Pursuant to Section 11 of the Purchase Agreement, FAPL, jointly and severally with the Principals, also agreed to indemnify MPA and pay for any damages arising out of, among other things, any breach or inaccuracy of any representation or warranty contained in this Agreement.

66.    MPA has performed all conditions, covenants, and promises required on its part in accordance with the terms and conditions of the Purchase Agreement.

67.    FAPL, on the other hand, has breached several representations and warranties contained in the Purchase Agreement.  This includes, but is not limited to the following representations (1) that Fenco's financial statements were prepared in accordance with Canadian GAAP, (2) that the Pre-Acquisition Financial Statements accurately reflected Fenco's financial position at the time of the acquisition, and (3) that none of the documents or information provided to MPA in connection with its acquisition of Fenco contained any untrue statement of a material fact, or failed to disclose a fact that was necessary to be made in order for any material statement not to be misleading at the time it was provided.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

68.    MPA has complied with all the requisite indemnification procedures provided in the Purchase Agreement.  Pursuant to Section 14(2), MPA tendered its Notice of Direct Claims to FAPL and the Principals on October 31, 2013.  By letters dated January 23, 2013, FAPL and the Principals disputed the validity and damages of the Direct Claims and refused to provide indemnification.  After MPA received the dispute notices, the parties attempted to resolve the dispute in a non-binding mediation and continued settlement discussions thereafter.  However, the parties have been unable to resolve the dispute.

69.    As a direct and proximate result of the Defendants' inaccurate representations and warranties, MPA has suffered substantial damages stemming from undisclosed liabilities and further damages that MPA has not determined at this time, but which are in excess of the jurisdictional limit of this court.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

(Against the Defendants)

70.    MPA repeats and realleges each and every allegation contained above as if fully set forth herein.

71.    The Defendants owed a duty to MPA to use reasonable care in connection with the offer and sale of the Fenco's capital stock.  The Defendants knew that MPA would rely on the Financial Statements for accurate information and an objective assessment of Fenco's financial position.

72.    The Defendants breached their duty to MPA by failing to use reasonable care in ascertaining the actual financial condition of Fenco and its subsidiaries and in failing to disclose materially adverse information regarding Fenco in connection with the offer, sale and purchase of its shares to MPA, a public company.

73.    Among other things, the Defendants failed to (a) ensure full and adequate disclosures in the Pre-Acquisition Financial Statements; (b) adequately verify with customers the accounts receivable and payable in reconciling customer accounts; (c)

1  adequately verify the asset values represented in the Pre-Acquisition Financial

2  Statements; (d) adequately verify sales, revenues and income; (e) adequately analyze

3  Fenco's business operations and financial performance; (f) recognize that the stated

4  assets were deficient, and that there was insufficient documentary and other evidence

5  to support the assets values as represented on the balance sheets contained in the Pre-

6  Acquisition Financial Statements; (g) properly evaluate reliability and credibility of

7  accounts payable and receivable in the Pre-Acquisition Financial Statements; (h)

8  identify that there was a substantial financial reporting risk because of the extreme

9  pressures and incentives to overstate sales and revenues; (j) recognize the true

10  financial value of Fenco, (k) adequately verify whether Fenco's internal controls were

11  conducive to accurate accounting, and (l) adequately verify that Fenco was using an

12  accounting method that is accepted within the industry and according to U.S. and

13  Canadian GAAP.

14      74.   MPA has been damaged as a direct and proximate result of the

15  Defendants' breaches and has suffered damages caused by those breaches in an

16  amount in excess of the jurisdictional minimum that will be determined according to

17  proof at trial.

18              **THIRD CAUSE OF ACTION**

19                **Common Law Fraud**

20                (Against the Defendants)

21      75.   MPA repeats and realleges each and every allegation contained above as

22  if fully set forth herein.

23      76.   FAPL and the Principals had a pecuniary interest in the acquisition. As

24  alleged above, Fenco had serious liquidity issues in the months leading up to the

25  acquisition. Without an interested investor, FAPL and the Principals would have to

26  repay outstanding loans.

27

28

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

77.   To induce MPA to acquire Fenco's outstanding capital stock, FAPL and the Principals made representations and warranties in the Purchase Agreement that were false, in that, at the time FAPL and the Principals made them, they knew that the Pre-Acquisition Financial Statements, on which MPA relied, omitted material information regarding Fenco's financial position, its business, including future liabilities to customers, suppliers, and employees, and its accounting policies.

78.   MPA was unaware that the Defendants' representations and promises were false.   MPA relied on those fraudulent misrepresentations and promises and agreed to purchase Fenco's capital stock in exchange for 360,000 shares of its common stock.   MPA's reliance was justifiable given the FAPL and the Principals' representations and willful concealment of their true intentions and the true state of Fenco's financial position, liquidity, and accounting practices when it was acquired. These misrepresentations were material as MPA incurred an additional $64 million in liabilities than it expected.   Had MPA known of the truth before it purchased Fenco's capital stock, it would not have agreed to pay 360,000 shares of its common stock for Fenco.

79.   As a direct and proximate result of the Defendants' fraudulent misrepresentations, MPA has suffered and continues to suffer substantial damages in the form of increased liabilities, and further damages that MPA has not determined at this time, but which are in excess of the jurisdictional limit of this court.   MPA will seek leave to amend the Complaint to state sums with specificity when known.

80.   The aforementioned conduct of FAPL and the Principals was an intentional misrepresentation, deceit and concealment of material facts known to them, with the intention on the part of said defendants to deprive MPA of property or legal rights or otherwise cause injury to MPA.   Such actions were done to induce MPA to acquire Fenco's outstanding stock for an inflated price and to secure releases for pre-existing security interests against the Defendants' property.   Accordingly, the Defendants' actions were willful, wanton, and oppressive and justify awarding

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

18
COMPLAINT

1  exemplary and punitive damages, sufficient to make an example of and punish FAPL

2  and the Principals.

## FOURTH CAUSE OF ACTION

### Violation of Section 10(b) and Rule 10b-5

(Against the Defendants)

6      81.    MPA repeats and realleges each and every allegation contained above as

7  if fully set forth herein.

8      82.    During all times relevant to this matter, the Defendants individually and

9  in concert with each other, employed devices, schemes and artifices to defraud MPA

10  and induce it to purchase Fenco's stock by disseminating or approved the materially

11  false and misleading statements described in Paragraph 67, which they knew were

12  misleading (or deliberately disregarded) and failed to disclose material facts necessary

13  to make the statements made, in light of the circumstances under which they were

14  made, not misleading.

15      83.    Specifically, the Defendants misrepresented and omitted facts material to

16  Fenco's financial position, including but not limited to (i) that the Pre-Acquisition

17  Financial Statements did not conform with Canadian or U.S. GAAP, (ii) the extent of

18  Fenco's outstanding core liabilities, including the fact that it instructed various

19  customers not to return cores until after the Purchase Agreement's execution date, (iii)

20  the terms of various side agreements with major customers, (iv) substantial inventory

21  and other payable amounts due to vendors for pre-acquisition transactions and/or

22  penalties, and (v) reasonable sales forecasts based on realistic fill rates.

23      84.    The Defendants knew that these statements and omissions were false or

24  acted with reckless disregard as to constitute willful deceit and fraud upon MPA.  The

25  Defendants had actual knowledge of Fenco's true financial position and knowingly

26  withheld the information from MPA during the due diligence period.  At the very

27  least, the Principals acted with reckless disregard to the knowledge with respect to the

28

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

truth of the representations and warranties at issue by failing to confirm the representations and warranties.

85.    The Defendants engaged in the acts, practices and course of business discussed above that operated as a fraud or deceit upon MPA in connection with a transaction involving the sale of securities listed on an American stock exchange.  In relevant part, the transaction took place domestically in that title to MPA's shares were transferred within the United States.

86.    MPA has suffered damages in that, in relying on the representations made by the Defendants and their failure to disclose the true facts concerning the Fenco's financial position, it paid an artificially inflated price for the stock of Fenco and was damaged thereby.

87.    At the time the forgoing material misrepresentations and omissions were made, MPA was unaware that they were false, and believed them to be true.  Had MPA known about these liabilities, it would not have agreed to pay the price it did for Fenco's stock.

### FIFTH CAUSE OF ACTION

### Control Person Liability

(Against the Principals)

88.    MPA repeats and realleges each and every allegation contained above as if fully set forth herein.

89.    As alleged above, the Principals are "control persons" under Section 20(a) of the Exchange Act.  By virtue of their high level positions, participation in and awareness of Fenco's operations, and intimate knowledge of the false statements made by Fenco and disseminated to the investing public, the Principals had the power to influence and control and did influence and control, directly or indirectly, the decision making of Fenco, including the content and dissemination of the various statements that MPA contends are false.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

90.    As specifically alleged in paragraphs 6-9, each of the Principals had a direct and supervisory involvement in the day-to-day operations of Fenco before the acquisition.  As specifically alleged in paragraph 39, each of the Principals maintained their respective roles after the acquisition.  As such, each Principal is presumed to have had the power to control or influence the accuracy of its financial accounts.

91.    As set forth below, each of the defendants violated Section 10b-5 of the Exchange Act of 1934 by making false statements of material fact and material omissions in connection with the purchase and sale of securities.  By virtue of their positions as controlling persons, the Principals are liable pursuant to Section 20(a) of the Exchange Act.

92.    As a direct and proximate result of the Principals' wrongful conduct, MPA has suffered damages in connection with the acquisition of Fenco's outstanding shares.

## PRAYER FOR RELIEF

WHEREFORE, MPA demands:

(1)    Compensatory damages against the Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(2)    Punitive damages against all Defendants, jointly and severally, in an amount to be proven at trial;

(3)    A declaratory judgment that the Defendants have an obligation pursuant to Section 11 of the Purchase Agreement to defend and hold MPA harmless from all damages arising out of their breach;

(4)    All reasonable costs and expenses, including attorney's fees and expert fees; and

(5)    Such other and further relief as the Court may deem just and proper.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

## JURY DEMAND

MPA hereby demands a trial by jury.

Dated:  February 13, 2014

Respectfully submitted,

LOCKE LORD LLP

By:_____
    Michael F. Perlis
    Cary J. Economou
    F. Phillip Hosp

Attorneys for Plaintiff
MOTORCAR PARTS OF AMERICA, INC.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

**EXHIBIT A**

*Execution Copy*

## PURCHASE AGREEMENT

Purchase Agreement dated May 6, 2011 between FAPL Holdings Inc. (the "**Vendor**"), Motorcar Parts of America, Inc. (the "**Purchaser**"), Jack Shuster, Gordon Fenwick, Paul Fenwick and Joel Fenwick.

RECITALS

(a)     The Vendor is the registered and beneficial owner of 10,001,500 common shares of Fenwick Automotive Products Limited ("**Canco**"), one (1) common share of Introcan Inc. ("**USco**"), and 500 Series "F" shares of Fapco S.A. de C.V. ("**Mexco**").

(b)     The Vendor and the Purchaser are, *inter alia*, parties to an amended and restated addendum to a Unanimous Shareholders Agreement dated December 15, 2010 (the "**Addendum**").

(c)     The Addendum provides for the MPA Option (as defined therein) pursuant to which the U.S. Purchaser has the option to acquire 80% of the shares of each of Canco and USco for the Option Purchase Price (as defined therein).

(d)     The Addendum provides the Purchaser with a Call Option (as defined therein) pursuant to which the Purchaser has the option to acquire all of the remaining shares of Canco and USco from the Vendor at the Call Purchase Price (as defined therein).

(e)     The Parties wish to terminate the Addendum and the Purchaser wishes to purchase and the Vendor wishes to sell to the Purchaser all of the shares of Canco, USco and Mexco (to the extent of its interest in Mexco) upon the terms and conditions contained in this Agreement.

(f)     Rafko Holdings Inc., a wholly-owned subsidiary of USco, is indebted to the Vendor in the amount of $768,042 (the "**RHI Loan**") and Rafko Enterprises Inc. a wholly-owned subsidiary of Rafko Holdings Inc., is indebted to the Vendor in the amount of $64,319 (the "**REI Loan**" and, together with the RHI Loan, the "**Rafko Loans**") and the Purchaser wishes to purchase and the Vendor wishes to assign and sell to the Purchaser the Rafko Loans.

In consideration of the foregoing and the mutual agreements contained in this Agreement (the receipt and adequacy of which are acknowledged), the parties agree as follows.

**Section 1        Definitions.**

All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in Schedule "A" hereto.

- 2 -

**Section 2      Purchase and Sale.**

Subject to the terms and conditions of this Agreement, the Vendor agrees to sell, assign and transfer to the Purchaser and the Purchaser agrees to purchase from the Vendor on the Closing Date: (i) 10,001,500 shares of Canco (the "**Canco Purchased Shares**"); (ii) one (1) common share of USco (the "**USco Purchased Shares**"); (iii) 500 Series "F" shares of Mexco (the "**Mexco Purchased Shares**" and, together with the USco Purchased Share and the Canco Purchased Shares, the "**Purchased Shares**"); and (iv) the Rafko Loans.

**Section 3      Purchase Price.**

The aggregate purchase price payable by the Purchaser to the Vendor for the Purchased Shares and the Rafko Loans shall be 360,000 shares of MPA Common Stock (the "**Vendor's MPA Shares**"). The purchase price shall be deemed to be paid by the Purchasers on the Closing Date by the delivery within five Business Days of the Closing Date to the Escrow Agent of a share certificate in definitive form registered in the name of the Vendor representing the Vendor's MPA Shares. The Purchaser hereby irrevocably undertakes to deliver the Vendor's MPA Shares to the Escrow Agent within five Business Days of the Closing Date. Notwithstanding anything contained in the Addendum or elsewhere, no Contingent Purchase Price (as defined in the Addendum) shall be payable. The Vendor's MPA Shares issued to the Vendor shall be subject to certain restrictions as set out in the Hold Agreement and the Escrow Agreement.

**Section 4      Allocation of Purchase Price.**

The purchase price shall be allocated among the Purchased Shares or set out in Schedule "B" hereto.

**Section 5      Vendor's Representations and Warranties.**

The Vendor represents and warrants as follows to the Purchaser at the date of this Agreement and at the Closing Date and acknowledges and confirms that the Purchaser is relying upon such representations and warranties in connection with the purchase of the Purchased Shares:

(a)     **Incorporation and Qualification.**  The Vendor is a corporation incorporated and existing under the laws of the Province of Ontario and its principal place of business is in Ontario.  The Vendor has the corporate power to enter into and perform its obligations under this Agreement;

(b)     **Corporate Authority.**  The execution and delivery of and performance by the Vendor of this Agreement have been authorized by all necessary corporate action on the part of the Vendor.  The transfers of the Purchased Shares to the Purchaser have been authorized by all necessary corporate action on the part of the Vendor, Canco, Mexco and USco, as the case may be;

(c)     **No Violation or Breach.**  The execution and delivery of and performance by the Vendor of this Agreement:

(i)     will not (or would not with the giving of notice, the lapse of time or the happening of any other event or condition) result in a breach or

- 3 -

violation of or a conflict with, or allow any other person to exercise any rights under, any of the terms or provisions of the Vendor's constating documents or by-laws as they currently are;

(ii)   will not (or would not with the giving of notice, the lapse of time or the happening of any other event or condition) result in a breach or violation of or a conflict with, or allow any other person to exercise any rights under any Material Agreements to which the Vendor is a party; and

(iii)   will not, to the best of the Vendor's knowledge, result in the violation of any Canadian, Mexican or US federal, state or provincial law;

(d)   **Authorizations and Consents.**   There is no requirement on the part of the Vendor, Canco, USco or Mexco to make any filing with or give any notice to any governmental entity or body, or obtain any order, permit, approval, waiver, licence or similar authorization in connection with the completion of the transactions contemplated by this Agreement, except for filings and notifications required by applicable securities laws;

(e)   **Execution and Binding Obligation.**   This Agreement has been duly executed and delivered by the Vendor and constitutes a legal, valid and binding agreement of the Vendor enforceable against it in accordance with its terms under the applicable laws of Canada and the laws of the province of Ontario subject only to any limitation under applicable laws relating to (i) bankruptcy, winding-up, insolvency, arrangement and other laws of general application affecting the enforcement of creditors' rights, and (ii) the discretion that a court may exercise in the granting of equitable remedies such as specific performance and injunction;

(f)   **Authorized and Issued Capital.**   The authorized capital of Canco consists of (i) 3,000,000 voting Class A special shares; (ii) an unlimited number of non-voting Class B special shares; (iii) 1,000,000 non-voting Class C special shares; (iv) 1,000,000 non-voting Class D special shares; (v) an unlimited number of Class E special shares; and (vi) an unlimited number of common shares of which, (i) at this date, 10,001,500 common shares (and no more) have been duly issued and are outstanding as fully paid, and (ii) at the Closing Date, 10,001,500 common shares (and no more) will be duly issued and will be outstanding as fully paid. The authorized capital of USco consists of one hundred (100) shares of common stock which, (i) at this date, one (1) share (and no more) has been duly issued and is outstanding as fully paid, and (ii) at the Closing Date, one (1) share of common stock (and no more) will be duly issued and will be outstanding as fully paid. The authorized capital of Mexco consists of fifty thousand (50,000) shares of fixed common series "F" shares and an unlimited number of variable common series "V" shares of which, (i) at this date, fifty thousand (50,000) series "F" shares (and no more) have been duly issued and are outstanding as fully paid and (ii) at the Closing Date, fifty thousand (50,000) series "F" shares (and no more) will be

- 4 -

duly issued and will be outstanding as fully paid. All of the Purchased Shares have been issued in compliance with all applicable laws;

(g)   **No Other Agreements to Purchase.**  Except for the Purchasers' rights under this Agreement and the Addendum, no person has any written or oral agreement, option or warrant or any right or privilege (whether by law, pre emptive or contractual) capable of becoming such for the purchase or acquisition from the Vendor of any of the Purchased Shares or any shares in the capital of the Subsidiaries;

(h)   **Title to Purchased Shares.**  The Purchased Shares are owned by the Vendor as the registered and beneficial owner with good and valid title, free and clear of all liens, charges, pledges, security interests and other encumbrances other than those restrictions on transfer, if any, contained in the constating documents of Mexco, Canco, and USco.  Upon completion of the transactions contemplated by this Agreement, the Purchaser will have good and valid title to the Purchased Shares, free and clear of all liens, charges, pledges, security interests and other encumbrances other than (i) those restrictions on transfer, if any, contained in the constating documents of Canco, USco, and Mexco and (ii) liens granted by the Purchaser;

(i)   **No Action.**  Other than as set out in Schedule G, the  Vendor is not aware of any action, suit or proceeding, at law or at equity, for or by any court or any federal, provincial, municipal or other governmental department, commission, board, agency or instrumentality which would prevent or materially adversely affect the transactions contemplated by this Agreement;

(j)   **Residence.**  The Vendor is not a non-resident of Canada for the purposes of the *Income Tax Act* (Canada); and

(k)   **Securities Laws.**  The Subsidiaries are not reporting issuers (as such term is defined in the *Securities Act* (Ontario)) and there is no published market for the Purchased Shares.

Canco is a "private issuer" as that term is defined in section 2.4(1) of National Instrument 45-106.

(l)   **Incorporation and Status.**  Each of the Subsidiaries is duly incorporated and organized, and is validly existing under its jurisdiction of organization. Each of the Subsidiaries is duly registered, licensed or qualified as an extra-provincial or foreign Corporation, and is up to date in the filing of all corporate and similar returns under the laws of those jurisdictions where it operates and where failure to be so registered, licensed, qualified or up to date would have a material adverse effect on it.

(m)   **Business of the Subsidiaries.**  Each of the Subsidiaries has the corporate power and capacity to own, lease or license its assets and to carry on its business.

- 5 -

(n)    **No Contravention.**   Neither the entering into of this Agreement, or the performance by the Vendor or the Subsidiaries of any of its other obligations hereunder will contravene, breach, result in any default or result in any acceleration, bonus or benefit to any other party under the articles, by-laws, constating documents or other organizational documents of the Vendor or the Subsidiaries or under any Material Agreements,  permit, statute, regulation, order, judgment, decree or law to which the Vendor or the Subsidiaries is a party or by which any of them may be bound.

(o)    **As to Certain Contracts In and Out of the Ordinary Course.**   The Subsidiaries are not a party to nor are they bound by any contract, agreement or commitment that materially adversely affects or could reasonably be expected to materially adversely affect the Subsidiaries' businesses or financial condition or any of their respective assets.   Additionally, since March 31, 2010, none of the Subsidiaries has:

(i)    other than in the ordinary course and consistent with past practices, sold, transferred or otherwise disposed of, or created, assumed or permitted any encumbrance on or in respect of, its property or assets or any part thereof, except in connection with the M&T Indebtedness;

(ii)    incurred, assumed or become subject to any material liability except in the ordinary course of business other than:

(A)    professional fees and other expenses incurred in respect of the indebtedness of the Subsidiaries to the Royal Bank of Canada, efforts to replace such indebtedness and entering into (and amending) the M&T Indebtedness and the transactional fees directly and indirectly related to the transactions contemplated hereby;

(B)    those Shareholder Advances made between March 31, 2010 and July 6, 2010; and

(C)    the M&T Indebtedness;

(iii)    amended its articles, by-laws or other governing documents;

(iv)    conducted its business, in all material respects, other than in the ordinary course;

(v)    cancelled or released any debts or claims or waived or surrendered any rights which, in the aggregate, are material; or

(vi)    except as described in the Vendor's financial statements, made any change in its accounting principles and practices as theretofore applied including, without limitation, the basis upon which its assets

- 6 -

and liabilities are recorded on its books and its earnings, profits and losses are ascertained.

(p)     **No Default Under Agreements.**  None of the Subsidiaries is in default or breach under any term or provision of its constating documents, by-laws or resolutions or of any contract, agreement, lease or other instrument to which it is a party which default or breach has had or could reasonably be expected to have a material adverse effect on the Subsidiaries taken as a whole and there exists no state of facts that after notice or the passage of time, or both, would constitute such a default or breach and all those contracts, agreements, leases and other instruments are now in good standing in all material respects, and the Subsidiaries are entitled to all benefits, rights and privileges thereunder save and except  as disclosed in Schedule "G" (collectively, the "Claims").

(q)     **Title to Assets.**  The Subsidiaries are the absolute beneficial owners of and have good and marketable title, free of all charges except for Permitted Encumbrances, to all the assets owned by them and used in connection with their respective businesses.

(r)     **Financial Matters.**  The audited consolidated financial statements of the Vendor and notes thereto as at and for the year ended March 31, 2010 and the unaudited 9 month period ended December 31, 2010, present fairly in all material respects the consolidated financial position of the Subsidiaries as at the dates indicated and the results of operations and changes in financial position for the periods specified and reflect all material liabilities (absolute, accrued, contingent or otherwise) of the Subsidiaries (on a consolidated basis) as of the dates thereof and such financial statements have been prepared in conformity with GAAP applied, except as otherwise stated therein, on a consistent basis.

(s)     **Licences and Agreements.** Subject to the Claims  and to the best of the Vendor's knowledge: (a) Each of the material licenses and agreements to which each of the Subsidiaries is a party is in good standing and in full force and effect; and (b) The Subsidiaries, is not in breach of any material covenants, conditions or obligations contained therein.

(t)     **Tax Matters.**  Save and except for the filing of any tax returns required as a result of the grant to the Purchaser of the MPA Option pursuant to the August 24, 2010 addendum to the Vendor's unanimous shareholders agreement, the Subsidiaries have filed or caused to be filed all tax returns required to be filed in all applicable jurisdictions and have paid all Governmental Charges. There are no proceedings in progress, pending or, threatened in respect of any Governmental Charges and, in particular, there are no currently outstanding reassessments or written enquiries that have been issued or raised by any governmental authority relating to any Governmental Charges.  The Subsidiaries have withheld or collected and

remitted all amounts required to be withheld or collected and remitted by them in respect of any Governmental Charges.

(u)     **Intellectual Property.** All registrations with and applications to governmental authorities in respect of the Intellectual Property are valid and in full force and effect and as of the date hereof are not subject to the payment of any taxes or maintenance fees or the taking of any other actions by the Subsidiaries to maintain their validity or effectiveness, other than routine filings and payments applicable to registrations of that kind. All Intellectual Property used by the Subsidiaries is owned by or, where necessary, licensed to, the Subsidiaries and the Subsidiaries have all rights, licenses, permits, authorizations and other approvals necessary to use that Intellectual Property. As of the date hereof, no notice has been received by any of the Subsidiaries that its rights to any Intellectual Property owned or licensed by it or otherwise used in the conduct of its business are invalid or unenforceable or that any infringement or misappropriation thereof, in whole or in part, by any Person has occurred, and no legal proceedings alleging any infringement of the Intellectual Property owned, licensed or used by any of the Subsidiaries in the conduct of their business have been initiated or, to the best of the knowledge, information and belief of the Vendor, threatened. To the best of the knowledge, information and belief of the Vendor, without due inquiry, the conduct of the business of the Subsidiaries does not infringe the intellectual property rights of any Person.

(v)     **Permits, Registrations and Elections.** To the best of the Vendor's knowledge and belief: (a) the Subsidiaries hold all permits, licenses, approvals, consents, authorizations, registrations, certificates and franchises of governmental agencies or regulatory bodies required to own their respective properties and assets and to carry on their businesses (collectively, the "Permits") except where the failure to hold such Permits would not have a material adverse effect on the Subsidiaries, taken as a whole; (b) all the Permits are in full force and effect; the Subsidiaries are in compliance in all material respects with all the terms and conditions relating to the Permits; and there are no proceedings in progress, pending or, threatened that may result in revocation, cancellation, suspension, rescission or any adverse modification of any of the Permits; and (c) there are no facts upon which proceedings could reasonably be based.

(w)     **Compliance with Laws and Litigation.**

(i)     To the best of the Vendor's knowledge and belief, the Subsidiaries are conducting their business in compliance with all applicable laws, regulations, by-laws and ordinances of each jurisdiction in which their business is carried on, except where the failure to be in such compliance would not have a material adverse effect on Subsidiaries, taken as a whole;

- 8 -

    (ii)    To the best of the Vendor's knowledge and belief, subject to the Claims and Duty Advisory, (a) There is no court, administrative, regulatory or similar proceeding (whether civil, quasi-criminal or criminal); arbitration or other dispute settlement procedure; investigation or enquiry by any governmental, administrative, regulatory or similar body; or any similar matter or proceeding (collectively, "Proceedings") against or involving the Subsidiaries or any of their officers or directors (whether in progress, pending or threatened); and (b) No event has occurred that might give rise to any Proceedings and the Vendor is not aware of any existing grounds on which such Proceedings might be commenced and there is no judgment, decree, injunction, rule, award or order of any court, government department, board, commission, agency, arbitrator or similar body outstanding against the Subsidiaries or their officers or directors.

(x)    **Material Facts Disclosed.**  None of the statements, documents, certificates or other items prepared or supplied by the Vendor or the Subsidiaries to the Purchaser with respect to the transactions contemplated hereby contains an untrue statement of a material fact, or failed to disclose a fact that was necessary to be made in order for any material statement not to be misleading at the time it was provided.

(y)    **Debt.**  At the time of Closing, the Subsidiaries will have no Debt other than Permitted Debt.

(z)    **Material Agreements.**  True, correct and complete copies of all Material Agreements requested by the Purchaser for review by it have been made available to the Purchaser. Subject to the Claims and the Duty Advisory and to the best of the Vendor's knowledge and belief, the Subsidiaries have performed substantially all of the obligations required to be performed by them and they are entitled to substantially all benefits under the Material Agreements. Save for the Claims and the Duty Advisory and to the best of the Vendor's knowledge and belief, none of the Subsidiaries is alleged to be in default of any Material Agreement. Save for the Claims and the Duty Advisory and to the best of the Vendor's knowledge and belief, each of the Material Agreements is in full force and effect, unamended, and to the best of the Vendor's knowledge and belief save for the Claims and the Duty Advisory there exists no default or event of default or event, occurrence, condition or act which, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default or event of default under any Material Agreement.

**Section 6**    **Purchaser's Representations and Warranties.**

    The Purchaser represents and warrants to the Vendor at the date of this Agreement and at the Closing Date and acknowledges and confirms that the Vendor is relying on such

- 9 -

representations and warranties in connection with the sale by the Vendor of the Purchased Shares:

(a)   **Incorporation and Qualification.** The Purchaser is a corporation incorporated and existing under the laws of the State of New York. The Purchaser has the corporate power to enter into and perform its obligations under this Agreement;

(b)   **Corporate Authority.** The execution and delivery of and performance by the Purchaser of this Agreement have been authorized by all necessary corporate action on the part of the Purchaser;

(c)   **No Violation or Breach.** The execution and delivery of and performance by the Purchaser of this Agreement:

(i)    will not (or would not with the giving of notice, the lapse of time or the happening of any other event or condition) result in a breach or violation of or a conflict with, or allow any other person to exercise any rights under, any of the terms or provisions of the Purchaser's constating documents or by-laws;

(ii)   will not (or would not with the giving of notice, the lapse of time or the happening of any other event or condition) result in a breach or violation of or a conflict with, or allow any other person to exercise any rights under any contracts or instruments to which the Purchaser is a party; and

(iii)  will not result in the violation of any law;

(d)   **Execution and Binding Obligation.** This Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding agreement of the Purchaser enforceable against it in accordance with its terms subject only to any limitation under applicable laws relating to (i) bankruptcy, winding-up, insolvency, arrangement and other laws of general application affecting the enforcement of creditors' rights, and (ii) the discretion that a court may exercise in the granting of equitable remedies such as specific performance and injunction;

(e)   **Authorizations and Consents.** There is no requirement on the part of the Purchaser to make any filing with or give any notice to any governmental entity or body, or obtain any order, permit, approval, waiver, licence or similar authorization in connection with the completion of the transactions contemplated by this Agreement, except for filings and notifications required by applicable securities laws; and

(f)   **MPA Common Stock.** The MPA Common Stock is the class of securities of the Purchaser listed on the NASDAQ Global Market as of the date of this Agreement. The Vendor's MPA Shares, when issued, sold and delivered to

- 10 -

the Vendor pursuant to this Agreement will be duly and validly issued and fully paid and non-assessable and registered in the name of the Vendor on the stock register of the Purchaser.

Section 7        Conditions of Closing.

(1)    **Conditions for the Benefit of the Purchaser.**   The purchase and sale of the Purchased Shares is subject to the following conditions to be fulfilled or performed, on or before the Closing Date, which conditions are for the exclusive benefit of the Purchaser and may be waived, in whole or in part, by the Purchaser in its sole discretion:

(a)    The covenants, representations and warranties of the Vendor contained in this Agreement shall be true and correct as of the Closing Date with the same force and effect as if such covenants, representations and warranties had been made on and as of such date;

(b)    The Vendor shall deliver to the Purchaser a certified copy of the resolution of each of the boards of the directors of Mexco, USco and Canco approving the transfer of the Purchased Shares to the Purchaser;

(c)    The share certificates representing the Purchased Shares shall be duly endorsed for transfer to the Purchaser as contemplated hereby or shall be accompanied by a irrevocable share transfer power of attorney duly executed in blank by the Vendor;

(d)    The M&T credit agreement in respect of the M&T Indebtedness shall have been amended to the satisfaction of the Purchaser and the transaction governed thereby shall close immediately following the transactions governed hereby;

(e)    The employment agreements with each of the Principals shall have been amended pursuant to the employment agreement amending agreements between each of the Principals and the Vendor on terms satisfactory to the Purchaser;

(f)    The Vendor shall have entered into and duly executed and delivered the Hold Agreement;

(g)    The Parties shall have entered into and duly executed and delivered the Escrow Agreement;

(h)    The Principals shall have entered into non-competition and non-solicitation agreements containing the restrictions set forth in Schedule "D" hereto;

(i)    All Shareholder Advances shall be capitalized and all Director Advances shall be forgiven in the manner set forth in Schedule "E" hereto (the "Reorganization");

- 11 -

(j) As at the Closing Date, no event or condition shall have occurred, or shall exist, that individually or in the aggregate is or would reasonably be expected to be material and adverse to the condition (financial or otherwise), properties, assets, liabilities, obligations, business, operations or prospects of the Subsidiaries;

(k) The Addendum shall be terminated; and

(l) The Vendor shall deliver a release in favour of the Subsidiaries of all amounts owing to it by the Subsidiaries and shall discharge all security in respect of such indebtedness.

(2) **Conditions for the Benefit of the Vendor.** The purchase and sale of the Purchased Shares is subject to the following conditions to be fulfilled or performed on or before the Closing Date, which conditions are for the exclusive benefit of the Vendor and may be waived, in whole or in part, by the Vendor in its sole discretion:

(a) The covenants, representations and warranties of the Purchasers contained in this Agreement shall be true and correct as of the Closing Date with the same force and effect as if such covenants, representations and warranties had been made on and as of such date;

(b) The Purchaser shall deliver releases by it and all Subsidiaries of the Vendor in respect of the Amended and Restated Debenture dated December 15th, 2010, and of each of the Principals in their capacity as directors of the Subsidiaries (excluding, for greater certainty, the obligations created herein or contemplated hereby);

(c) The Purchaser shall discharge its security interest against the Vendor in connection with the Amended and Restated Debenture dated December 15th, 2010;

(d) Delivery of certified resolutions of the Purchaser authorizing the execution and delivery of this Agreement and all matters required of the Purchaser thereunder;

(e) M&T Bank shall release the Vendor, the Holdcos and each of the Principals in respect of the outstanding M&T credit agreement and release all security interests held by it as against such releases; and

(f) The Addendum shall be terminated; and

(g) Delivery by the Purchaser of its consent to the Reorganization and all proceedings contemplated thereby.

**Section 8** **Closing.**

The completion of the transaction of purchase and sale contemplated by this Agreement (the "**Closing**") shall take place at the offices of Torkin Manes LLP, 151 Yonge

- 12 -

Street, Suite 1500, Toronto, Ontario at 5:00 p.m. (Toronto time) on May 5, 2011 or at such other place, on such other date and such other time as may be agreed upon in writing by the parties (the "Closing Date").

Section 9      Deliveries.

Subject to the satisfaction or waiver by the relevant party of the conditions of closing, on the Closing Date, the Vendor shall deliver actual possession of the Purchased Shares to the Purchaser and upon such delivery, the Purchaser shall pay the purchase price in accordance with Section 3 (i.e. by delivery of fully executed stock certificates, in definitive form, representing the Vendor's MPA Shares payable to the Vendor). Notwithstanding the foregoing, in the case of the Mexco Purchased Shares, a duly endorsed power of attorney to transfer such shares shall be delivered to the Purchaser at Closing along with a photocopy of the certificate evidencing such shares and the Vendor shall deliver the original certificate within seven days of the Closing.

Section 10      Survival of Covenants, Representations and Warranties.

(1)      The covenants, representations and warranties of the Vendor contained in this Agreement and in any certificates or documents delivered pursuant to or in connection with the transactions contemplated by this Agreement shall survive the Closing for a period of 18 months, except that there is no limitation as to time for claims involving fraud or fraudulent misrepresentation.

(2)      The covenants, representations and warranties of the Purchaser contained in this Agreement and in any certificates or documents delivered pursuant to or in connection with the transactions contemplated by this Agreement shall survive the Closing for a period of 18 months, except that there is no limitation as to time for claims involving fraud or fraudulent misrepresentation.

Section 11      Indemnification in Favour of the Purchaser.

Subject to Section 13, the Vendor, jointly and severally with the Principals (but severally and not jointly and severally among the Principals), agree to indemnify and save the Purchaser harmless of and from, and shall pay for, any damages suffered by, imposed upon or asserted against it as a result of, in respect of, connected with, or arising out of, under, or pursuant to:

(1)      any breach or inaccuracy of any representation or warranty given by the Vendor contained in this Agreement;

(2)      any liability for Governmental Charges due or payable by the Subsidiaries in respect to or relating to all periods ending on or before the Closing Date (including with respect to the Duty Advisory);

(3)      any liability (in excess of any insurance payments) relating to any product manufactured, constructed, installed, shipped, distributed, sold or provided, by any of the Subsidiaries prior to the Closing Date, including any product liability or product warranty whether the damages in respect of such products are suffered before or after the Closing; and

- 13 -

(4)     any liability in excess of the disclosed Claims referenced in Schedule "G".

### Section 12     Termination.

This Agreement may, by notice in writing given at or prior to the completion of the transaction, be terminated:   (i) by mutual consent of the Vendor and the Purchaser; (ii) by the Purchaser if any of the conditions in Section 7(1) have not been satisfied as at the Closing Date and the Purchaser have not waived such condition at or prior to completion of the transaction; or (iii) by the Vendor if any of the conditions in Section 7(2) have not been satisfied as at the Closing Date and the Vendor has not waived such condition at or prior to completion of the transaction.

### Section 13     Limitations on Indemnification.

The Vendor's obligation to make any payment for damages (for indemnification or otherwise) with respect to the matters described in Section 11 shall be limited to a maximum of $4 million.

Each Principal's obligation to make any payment for damages (for indemnification or otherwise) with respect to the matters described in Section 11 shall be limited to a maximum of $250,000.

The Purchaser shall first be required to seek indemnification from the Vendor before seeking indemnification from the Principals.  The Vendor shall only seek indemnification from the Principals in the event that the indemnifiable claims exceed the value of the Vendor's MPA Shares redeemed or purchased for cancellation in accordance with the Escrow Agreement.

The Indemnifying Parties shall have the option of satisfying any indemnifiable claims in cash in lieu of the redemption or purchase for cancellation of Vendor's MPA Shares pursuant to the Escrow Agreement. Each Principal shall notify the Purchaser and the Escrow Agent in writing within 6 months following the receipt of notice of a Direct Claim or within the later of 6 months following receipt of notice of a Third Party Claim and 45 days following final resolution of a Third Party Claim, as the case may be, as to his election whether to satisfy an indemnifiable claim in cash or through the redemption or purchase for cancellation of Vendor's MPA Shares pursuant to the Escrow Agreement. Cash payments and redemptions or purchases for cancellation of Vendor MPA Shares in accordance with the Escrow Agreement shall be made within five business days following the date on which the Principal notifies the Purchaser of his election. A failure to make due and prompt payment of the cash amount owing shall result in a forfeiture of the right to settle the indemnity obligation in cash and the corresponding Vendor's MPA Shares shall be immediately be redeemed or purchased for cancellation pursuant to the Escrow Agreement. Any cash payments made by a Principal hereunder shall reduce such Principal's maximum liability for indemnification hereunder.

Nothing in this Agreement, including this Section 13, limits or restricts in any way any remedies available, or damages payable, for claims involving fraud or fraudulent misrepresentation.

- 14 -

**Section 14     Indemnification Procedures.**

(1)     Notification.

(a)     If a Third Party Claim is instituted or asserted against the Purchaser or a Subsidiary (an "Indemnified Person"), the Indemnified Person shall promptly notify the Indemnifying Parties in writing of the Third Party Claim.

(b)     If an Indemnified Person becomes aware of a Direct Claim, the Indemnified Person shall promptly notify the Vendor and the Principals (the "Indemnifying Parties") in writing of the Direct Claim.

(c)     Notice to the Indemnifying Parties under this Section of a Direct Claim or a Third Party Claim is assertion of a claim for indemnification against the Indemnifying Parties under this Agreement. Upon receipt of such notice, the provisions of Section 14(3) will apply to any Third Party Claim and the provisions of Section 14(2) will apply to any Direct Claim.

(d)     The omission to promptly notify the Indemnifying Parties shall not relieve the Indemnifying Parties from any obligation to indemnify the Indemnified Person.

(2)     Procedure for Direct Claims.

(a)     Following receipt of notice of a Direct Claim, the Indemnifying Parties have 30 days to investigate the Direct Claim and respond in writing. For purposes of the investigation, the Indemnified Person shall make available to the Indemnifying Parties the information relied upon by the Indemnified Person to substantiate the Direct Claim, together with such other information as the Indemnifying Parties may reasonably request.

(b)     If the Indemnifying Parties dispute the validity or amount of the Direct Claim, the Indemnifying Parties shall provide written notice of the dispute to the Indemnified Person within the 30 day period specified above. The dispute notice must describe in reasonable detail the nature of the Indemnifying Parties' dispute. During the 15 day period immediately following receipt of a dispute notice by the Indemnified Person, the Indemnifying Parties and the Indemnified Person shall attempt in good faith to resolve the dispute.

(c)     If the Indemnifying Parties and the Indemnified Person fail to resolve the dispute within that 15 day time period, the Indemnified Person is free to pursue all rights and remedies available to it, subject only to this Agreement. If the Indemnifying Parties fail to respond in writing to the Direct Claim or within the 30 day period specified above, do not dispute it or resolve a dispute with the Indemnified Person, the Indemnifying Parties are deemed to have agreed to the validity and amount of the Direct Claim (revised, as applicable, in the case of a resolved dispute in respect of the Direct Claim) and shall pay in full the amount of the Direct Claim to the Indemnified

- 15 -

Person within 6 months of receipt of notice of the Direct Claim in accordance with Section 13.

(3)     **Procedure for Third Party Claims.**

    (a)     Subject to the terms of this Section, upon receiving notice of a Third Party Claim, the Indemnifying Parties may participate in the investigation and defence of the Third Party Claim and may also elect to assume the investigation and defence of the Third Party Claim.

    (b)     The Indemnifying Parties may not assume the investigation and defence of a Third Party Claim if:

        (i)     it relates to Taxes of the Indemnified Person, nor may the Indemnifying Parties participate in the investigation and defence of such a claim;

        (ii)     the Indemnifying Parties are also a party to the Third Party Claim and the Indemnified Person determines in good faith that joint representation would be inappropriate;

        (iii)     the Indemnifying Parties fail to provide reasonable assurance to the Indemnified Person of its financial capacity to defend the Third Party Claim and provide indemnification with respect to the Third Party Claim;

        (iv)     the Indemnifying Parties do not unconditionally acknowledge in writing their obligation to indemnify and hold the Indemnified Person harmless with respect to the Third Party Claim; or

        (v)     the Third Party Claim seeks relief against the Indemnified Person other than monetary damages or the Indemnified Person determines in good faith that there is a reasonable probability that the Third Party Claim may adversely affect it or its affiliates (as such term is defined in National Instrument 45-106) and the Indemnified Person has notified the Indemnifying Parties that it will exercise its exclusive right to defend, compromise or settle the Third Party Claim.

    (c)     In order to assume the investigation and defence of a Third Party Claim, the Indemnifying Parties must give the Indemnified Person written notice of its election within 15 days of Indemnifying Parties' receipt of notice of the Third Party Claim.

    (d)     If the Indemnifying Parties assume the investigation and defence of a Third Party Claim:

        (i)     the Indemnifying Parties shall pay for all costs and expenses of the investigation and defence of the Third Party Claim except that the

- 16 -

Indemnifying Parties shall not, so long as they diligently conduct such defence, be liable to the Indemnified Person for any fees of other counsel or any other expenses with respect to the defence of the Third Party Claim, incurred by the Indemnified Person after the date the Indemnifying Parties validly exercised their right to assume the investigation and defence of the Third Party Claim;

(ii)     the Indemnifying Parties shall reimburse the Indemnified Person for all costs and expenses incurred by the Indemnified Person in connection with the investigation and defence of the Third Party Claim prior to the date the Indemnifying Parties validly exercised their right to assume the investigation and defence of the Third Party Claim;

(iii)    the Indemnified Person shall not contact or communicate with the Person making the Third Party Claim without the prior written consent of the Indemnifying Parties, unless required by applicable Law;

(iv)     legal counsel chosen by the Indemnifying Parties to defend the Third Party Claim must be satisfactory to the Indemnified Person, acting reasonably; and

(v)      the Indemnifying Parties may not compromise and settle or remedy, or cause a compromise and settlement or remedy, of a Third Party Claim without the prior written consent of the Indemnified Person, which consent may not be unreasonably withheld or delayed.

(e)     If the Indemnifying Parties (i) are not entitled to assume the investigation and defence of a Third Party Claim; (ii) do not elect to assume the investigation and defence of a Third Party Claim; or (iii) assume the investigation and defence of a Third Party Claim but fail to diligently pursue such defence, or the Indemnified Person concludes that the Third Party Claim is not being defended to its satisfaction, acting reasonably, the Indemnified Person has the right (but not the obligation) to undertake the defence of the Third Party Claim. In the case where the Indemnifying Parties fail to diligently pursue the defence of the Third Party Claim or the Indemnified Person concludes that the Third Party Claim is not being defended to its satisfaction, acting reasonably, the Indemnified Person may not assume the defence of the Third Party Claim unless the Indemnified Person gives the Indemnifying Parties written demand to diligently pursue the defence and the Indemnifying Parties fail to do so within 14 days after receipt of the demand, or such shorter period as may be required to respond to any deadline imposed by a court, arbitrator or other tribunal.

(f)     If the Indemnified Person undertakes the investigation and defence of a Third Party Claim, the Indemnified Person may compromise and settle the Third Party Claim but the Indemnifying Parties shall not be bound by any

compromise or settlement of the Third Party Claim effected without their consent (which consent may not be unreasonably withheld or delayed).

(g)     The Indemnified Person and the Indemnifying Parties agree to keep each other fully informed of the status of any Third Party Claim and any related proceedings and to use their reasonable efforts to minimize Damages with respect to any Third Party Claim. If the Indemnifying Parties assume the investigation and defence of a Third Party Claim, the Indemnified Person shall, at the request and expense of the Indemnifying Parties, use its reasonable efforts to make available to the Indemnifying Parties, on a timely basis, those employees whose assistance, testimony or presence is necessary to assist the Indemnifying Parties in investigating and defending the Third Party Claim. The Indemnified Person shall, at the request and expense of the Indemnifying Parties, make available to the Indemnifying Parties, or their representatives, on a timely basis all documents, records and other materials in the possession, control or power of the Indemnified Person, reasonably required by the Indemnifying Parties for their use solely in defending any Third Party Claim which they have elected to assume the investigation and defence of. The Indemnified Person shall cooperate on a timely basis with the Indemnifying Parties in the defence of any Third Party Claim.

(h)     The Indemnified Parties shall have until the later of 6 months following receipt of notice of a Third Party Claim and 45 days following final resolution of a Third Party Claim to pay in full the amount of the Third party Claim in accordance with Section 13.

Section 15     Time of the Essence.

Time shall be of the essence of this Agreement.

Section 16     Addendum

The parties hereto hereby agree to terminate the Addendum as of the Closing Date.

Section 17     Enurement.

This Agreement shall become effective when executed by the Vendor and the Purchaser and after that time shall be binding upon and enure to the benefit of the parties and their respective, successors and permitted assigns. Neither this Agreement nor any of the rights or obligations under this Agreement shall be assignable or transferable by either party without the consent of the other party.

Section 18     Entire Agreement.

This Agreement (including any agreements contemplated hereby) collectively constitute the entire agreement between the parties with respect to the transactions contemplated in this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties with respect to the subject matter of this Agreement. There are no representations, warranties, covenants, conditions or other agreements, express or implied, collateral, statutory or otherwise, between the parties in connection with the subject matter of this Agreement, except as

- 18 -

specifically set forth in this Agreement.  The parties have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Agreement.

Section 19      Currency.

All references to dollar amounts or "$" herein are expressed in Canadian currency unless otherwise specifically indicated.

Section 20      Waiver.

(1)      No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision (whether or not similar), nor shall such waiver be binding unless executed in writing by the party to be bound by the waiver.

(2)      No failure on the part of the Vendor or the Purchaser to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver of such right; nor shall any single or partial exercise of any such right preclude any other or further exercise of such right or the exercise of any other right.

Section 21      Further Assurances.

Each of the parties covenants and agrees to do such things, to attend such meetings and to execute such further documents and assurances as may be deemed necessary or advisable from time to time in order to carry out the terms and conditions of this Agreement in accordance with their true intent, including without limitation the assignment of all Intellectual Property used in connection with the business conducted by the Subsidiaries.

Section 22      Notices

Any notice, direction or other communication given pursuant to this Agreement (each a "**Notice**") must be in writing, sent by personal delivery, courier or facsimile (but not by email) and addressed:

(a)      to the Purchaser, at:

2929 California Street
Torrance CA 90503
United States of America

Attention:      Michael M. Umansky
Telephone:      (310) 972-4015
Facsimile:      (310) 943-1630

with a copy (that does not constitute notice) to:

Stikeman Elliott LLP
Barristers & Solicitors
5300 Commerce Court West,
199 Bay Street,
Toronto, ON

- 19 -

M5L 1B9
Canada

Attention:    David Weinberger
Telephone:    (416) 869-5515
Facsimile:    (416) 947-0866

(b)    to Gordon Fenwick at:

475 Spadina Road
Toronto, ON
M5P 2W6

(c)    to Paul Fenwick at:

125 Bedford Road
Toronto, ON
M5R 2K6

(d)    to Joel Fenwick at:

28 Ridge Hill Drive
Toronto, ON
M6G 3A3

(e)    to the Vendor at:

1100 Caledonia Road
Toronto, ON
M6A 2W5

Attention:    Jack Shuster, President
Telephone:    (416) 787-1723
Facsimile:    (416) 784-1197

with a copy (that does not constitute notice) to:

Wisebrod/Zeliger Associates
Barristers & Solicitors, Notaries
245 Fairview Mall Drive
Suite 510
Toronto, ON
M2J 4T1

Attention :    Avi Wisebrod
Telephone:    (416) 496-2600 x 201
Facsimile:    (416) 496-1708

- 20 -

(f)    to Jack Shuster at:
48 King Cross Avenue
Richmond Hill, ON
L4B 2S9

A Notice is deemed to be given and received (i) if sent by personal delivery or same day courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, (ii) if sent by overnight courier, on the next Business Day, or (iii) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile. A Party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any subsequent Notice must be sent to the Party at its changed address. Any element of a Party's address that is not specifically changed in a Notice will be assumed not to be changed.

## Section 23    Severability.

If any provision of this Agreement shall be determined to be illegal, invalid or unenforceable, that provision shall be severed from this Agreement and the remaining provisions shall continue in full force and effect.

## Section 24    Governing Law.

This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein without reference to any choice of law rules. Each Party irrevocably attorns and submits to the non-exclusive jurisdiction of the Ontario courts situated in the City of Toronto and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

## Section 25    Counterparts.

This Agreement may be executed in any number of counterparts (including counterparts by facsimile) and all such counterparts taken together shall be deemed to constitute one and the same instrument.

## Section 26    French Language.

Les parties à cette convention reconnaissent qu'ils ont exigé que ce qui précède soit rédigé et signé en anglais et s'en déclarent satisfaits.

**FAPL HOLDINGS INC.**

By: _____

Name: Jack Shuster

Title:   President

By: _____

Name: Joel Fenwick

Title: VP

_____

Gordon Fenwick

_____

Jack Shuster

_____

Paul Fenwick

_____

Joel Fenwick

IN WITNESS WHEREOF the parties have executed this Purchase Agreement.

FAPL HOLDINGS INC.

By: _____
　　　Name:
　　　Title:

MOTORCAR PARTS OF AMERICA,
INC.

By: _____
　　　Name:
　　　Title:

_____
Gordon Fenwick

_____
Jack Shuster

_____
Paul Fenwick

_____
Joel Fenwick

SCHEDULE "A"
DEFINITIONS

"Business Day" means any day of the year, other than a Saturday, Sunday or any day on which major banks are closed for business in Toronto, Ontario.

"Debt" means, without duplication:

(i)     all indebtedness of the Subsidiaries for or in respect of borrowed money, credit or other financial accommodation, including liabilities and obligations (whether contingent or otherwise) with respect to letters of credit, letters of guarantee, bankers' acceptances or similar instruments issued or accepted by banks and other financial institutions for the account of the Subsidiaries;

(ii)    all indebtedness of the Subsidiaries for or in respect of the purchase or acquisition price of property or services, whether or not recourse is limited to the repossession and sale of any such property;

(iii)   all obligations under any lease entered into by the Subsidiaries as lessee which would be classified as a capital lease in accordance with GAAP;

(iv)    all obligations of the Subsidiaries to purchase, redeem, retract or otherwise acquire any securities issued by the Subsidiaries; and

(v)     all Debt (as hereinbefore defined) or any other debt which is directly or indirectly guaranteed by the Subsidiaries or which any of the Subsidiaries has agreed to purchase or otherwise acquire or in respect of which any of the Subsidiaries have otherwise assured a creditor against loss;

but "Debt" shall not include unsecured trade debt incurred in the ordinary course of business consistent with past practice, nor any contingent liabilities (other than guarantees) in connection with contracts entered into in the ordinary course of business;

"Direct Claim" means any cause, matter, thing, act, omission or state of facts not involving a Third Party Claim which entitles an Indemnified Person to make a claim for indemnification under this Agreement;

"Director Advances" means amounts owing from the Subsidiaries to any of the Principals or directors of any Subsidiaries on account of loans advanced by such Principals or directors to the Subsidiaries;

"Duty Advisory" means the ruling by US Customs and Border Protection concerning trade/tariff (anti dumping duty) with respect to importation into the U.S. of Hub Bearing Assemblies containing taper bearings;

"Escrow Agent" means Stikeman Elliott LLP, as it may be replaced from time to time pursuant to the Escrow Agreement;

- 2 -

"**Escrow Agreement**" means the escrow agreement among the Parties in the form attached as Schedule "H" hereto;

"**FEI**" means Fenwick enterprises Inc.

"**GAAP**" means, at any time, the generally accepted accounting principles in Canada, applied on a consistent basis, and statements and interpretations (if applicable) issued by the Canadian Institute of Chartered Accountants or any successor body in effect from time to time;

"**Governmental Charges**" means all taxes, levies, assessments, reassessments and other charges together with all related penalties, interest and fines, due and payable to any domestic or foreign government (federal, provincial, municipal or otherwise) or to any regulatory authority, agency, commission or board of any domestic or foreign government, or imposed by any court or any other law, regulation or rulemaking entity having jurisdiction in relevant circumstances if failure to pay could reasonably be expected to have a material adverse effect on the Subsidiaries;

"**Hold Agreement**" means the form of Hold Agreement attached as Schedule "F" hereto;

"**Holdcos**" means Escal Holdings Inc., Fencity Holdings Inc. and Jofen Holdings Inc.,

"**Intellectual Property**" means domestic and foreign intellectual property rights including: (i) patents, applications for patents and reissues, divisions, continuations, renewals, extensions and continuations-in-part of patents or patent applications; (ii) copyrights, copyright registrations and applications for copyright registration; (iii) mask works, mask work registrations and applications for mask work registrations; (iv) designs, design registrations, design registration applications and integrated circuit topographies and (v) trade names, business names, corporate names, domain names, website names and world wide web addresses, common law trade-marks, trade-mark registrations, trade mark applications, trade dress and logos, and the goodwill associated with any of the foregoing;

"**Lien**" means any lien, mortgage, charge, hypothec, pledge, security interest, prior assignment, option, warrant, lease, sublease, right to possession, encumbrance, claim, right or restriction which affects, by way of a conflicting ownership interest or otherwise, the right, title or interest in or to any particular property;

"**Material Agreements**" means all agreements to which any of the Subsidiaries is a party with a value of greater than $175,000;

"**M&T Credit Agreement**" means an amended credit agreement dated May 5, 2011 among, *inter alia*, Canco and M&T Bank;

"**M&T Indebtedness**" means the indebtedness of Canco to M&T Bank pursuant to the terms of the M&T Credit Agreement;

- 3 -

"**Parties**" means the Vendor, the Purchaser and the Principals;

"**Permitted Debt**" means the M&T Indebtedness, any indebtedness disclosed in this Agreement, any indebtedness secured by Permitted Encumbrances, indebtedness among any of the Subsidiaries, accounts payable, accrued liabilities, income tax, deferred revenues, operating leases and other expenses incurred in the ordinary course of business, consistent with past practice, and capital lease obligations incurred in the ordinary course of business (such existing capital lease obligations being subject to a limit of $806,000.00) consistent with past practice, and includes, without limitation, the Subsidiaries' obligations under existing and future real property leases and all professional fees relating to the transactions contemplated by this Agreement and the M&T Credit Agreement;

"**Permitted Encumbrances**" has the meaning attributed thereto in Schedule "B" hereto;

"**Person**" means any individual, partnership, limited partnership, joint venture, syndicate, sole proprietorship, company or corporation with or without share capital, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, regulatory body or agency, government or governmental agency, authority or entity however designated or constituted;

"**Principal**" means each of Gordon Fenwick, Joel Fenwick, Paul Fenwick and Jack Shuster;

"**Shareholder Advances**" means amounts owing from the Subsidiaries to the Vendor on account of loans advanced by the Vendor to the Subsidiaries;

"**Subsidiaries**" means Canco, USco, Mexco, Autocat Catalogue Services, Inc., 778355 Ontario Inc., Rafko Enterprises Inc., Rafko Logistics Inc., Rafko Holdings Inc., LH Distribution Inc., and Flo-Pro Inc.; and

"**Third Party Claim**" means any action, suit, proceeding, arbitration, claim or demand that is instituted or asserted by a third party, including a governmental entity, against an Indemnified Person which entitles the Indemnified Person to make a claim for indemnification under this Agreement.

SCHEDULE "B"
PERMITTED ENCUMBRANCES

(a)     liens for taxes, assessments, governmental charges or levies not at the time due unless contested in good faith by all necessary proceedings;

(b)     defects or irregularities in title to land, easements, rights of way or other similar rights in land existing at the date of this Agreement which in the aggregate do not materially impair the usefulness in the business of the subsidiary of the property subject thereto;

(c)     rights reserved to or vested in any municipality or governmental or other public authority by the terms of any lease, licence, franchise, grant or permit, or by any statutory provision, to terminate the same or to require annual or other periodic payments as a condition to the continuance thereof;

(d)     any lien or encumbrance the validity of which is being contested by the corporation in question in good faith and in respect of which either there shall have been deposited with the Purchaser cash in an amount sufficient to satisfy the same or the Purchaser shall be otherwise satisfied that its interests are not prejudiced thereby;

(e)     any reservations, limitations, provisos and conditions expressed in any original grant from the Crown;

(f)     title defects or irregularities which, in the opinion of counsel to the Purchaser, are of a minor nature and in the aggregate shall not materially impair the usefulness in the business of the corporation in question;

(g)     a security interest in cash or governmental obligations deposited in the ordinary course of business in connection with contracts, bids, tenders or to secure worker's compensation, unemployment insurance, surety or appeal bonds, costs of litigation when required by law, public and statutory obligations, liens or claims incidental to current construction, mechanics', warehousemen's, carriers' and other similar liens;

(h)     security given in the ordinary course of business to a public utility or any municipality or governmental or other public authority when required by such utility or municipality or governmental or other authority in connection with the operations of the corporation in question;

(i)     a security interest arising under a lease entered into in the ordinary course of business over the goods that are the subject matter of such lease, to an aggregate amount of $100,000;

(j)     a security interest in or title retention relating to Equipment or Inventory (as defined in the *Personal Property Security Act* (Ontario), as amended) which is created to secure the unpaid purchase price thereof or retain title thereto until so paid, provided that each such security interest is limited to the asset so acquired (and any insurance or other proceeds thereof) and does not secure an amount in excess of the purchase

- 2 -

price thereof or any re-advance on the security of the Equipment or Inventory (as defined in the *Personal Property Security Act* (Ontario), as amended);

(k)     security given in favour of the Purchaser;

(l)     security given by the any Subsidiary to secure its obligations in respect of the M&T Indebtedness;

(m)    other encumbrances arising by operation of law or which are not material in character, amount, and extent and do not materially detract from the value or use of the assets of the corporation in question; and

(n)     liens held by customers of the corporation in question in respect of the work-in-progress relating to: (i) goods under production for customers and any assignment of such liens to third parties as approved by the Purchaser; and (ii) all equipment drop shipped to the corporation in question by its customers (or suppliers) for integration to machinery which is owned by such customers (or suppliers).

SCHEDULE "C"
PURCHASE PRICE ALLOCATION

1.  Mexco Purchased Shares - $15,000

2.  Usco Purchased Shares - $100,000

3.  Canco Purchased Shares and Rafko Loans– the balance of the purchase price.

## SCHEDULE "D"
## NON-COMPETITION AND NON-SOLICITATION COVENANTS

**Non-Competition.**

For a period of two years following the later of the date hereof and one year following the date upon which the employment of a Principal by the Subsidiaries is terminated for any reason, such Principal shall not, on his own behalf or on behalf of or in connection with any Person, directly or indirectly, in any capacity whatsoever, carry on, be engaged in, have any financial or other interest in or be otherwise commercially involved in any endeavour, activity or business in all or any part of Canada or the United States in which the Subsidiaries conduct business on the date hereof (the "Territory") which is substantially the same as or is in competition, in whole or in part, with the business of manufacturing and remanufacturing of after market auto parts (the "Business").

**Non-Solicitation of Customers.**

For a period of two years following the later of the date hereof and one year following the date upon which the employment of a Principal by the Subsidiaries is terminated for any reason, such Principal shall not, on his own behalf or on behalf of or in connection with any other Person, directly or indirectly, in any capacity whatsoever:

> (A)     canvass or solicit the business of (or procure or assist the canvassing or soliciting of the business of) any customer or prospective customer of the Subsidiaries;

> (B)     accept (or procure or assist the acceptance of) any business from any customer or prospective customer of the Subsidiaries; or

> (C)     supply (or procure or assist the supply of) any goods or services to any customer or prospective customer of the Subsidiaries.

provided that the "canvassing", "soliciting", "accepting business" and "supplying" prohibited above is limited in each case to undertaking such activity in relation to services or products which are substantially the same as or in competition, in whole or in part, services or products manufactured, remanufactured or distributed in connection with the Business in the relevant period.

**Non-Solicitation of Employees.**

For a period of two years following the later of the date hereof and one year following the date upon which the employment of a Principal by the Subsidiaries is terminated for any reason, such Principal shall not, on their own behalf or on behalf of or in connection with any other Person, directly or indirectly, in any capacity whatsoever:

> (D)     employ, offer employment to or solicit the employment or engagement of or otherwise entice away from the employment of the Subsidiaries any individual who is employed by the Subsidiaries, whether or not such individual would commit any breach of his

- 2 -

contract or terms of employment by leaving the employ of the Subsidiaries; or

(E)     procure or assist any Person to employ, offer employment or solicit the employment or engagement of or otherwise entice away from the employment of the Subsidiaries any such individual who is employed by the Subsidiaries, whether or not such individual would commit any breach of his contract or terms of employment by leaving the employ of the Subsidiaries.

SCHEDULE "E"
PRE-CLOSING REORGANIZATION

A.   **Purposes of the Transactions:**

1.   To capitalize all of the existing indebtedness owed by Canco to the Vendor in the amount of $5,201,420.00 (the "**FAPL Indebtedness**") immediately prior to closing of the subscription transaction referred to below.

2.   To eliminate the Vendor as account creditor of Rafko Holdings Inc. and Rafko Enterprises Inc. in respect of the following debts:

   (a)   the sum of $768,042 owed by Rafko Holdings Inc. to the Vendor; and

   (b)   the sum of $64,319 owed by Rafko Enterprises Inc. to the Vendor.

3.   To eliminate the debts owed by Canco to its individual directors.

4.   To eliminate the debt in the aggregate amount of $2356 owing to the Vendor by Mexco.

B.   **Steps:**

Part I - Canco debt owed to the Vendor

1.   The Vendor and Canco will enter into a subscription agreement pursuant to which the Vendor subscribes for 10,000,000 common shares in the capital stock of Canco (the "**Subscribed Shares**").

2.   The subscription price for the Subscribed Shares will be that amount which is equal to the face value of the FAPL Indebtedness.

3.   The subscription price for the Subscribed Shares will be satisfied on the closing of the subscription transaction by the delivery to Canco of a full and final release of the FAPL Indebtedness.

4.   Immediately following the said closing, the Vendor will own 10,001,500 common shares in the capital stock of Canco and the FAPL indebtedness will have been eliminated.

5.   Immediately following the said closing, the directors of Canco will declare their determination of the stated capital of the 10,001,500 common shares of Canco by way of resolution. The stated capital will be equal to the market value of the 360,000 shares of MPA common stock (as of close of business on the day prior to the Closing Date) issued to the Vendor pursuant to the Agreement less (a) $100,000 for the shares of Introcan Inc., (b) $15,000 for the shares of Fapco S.A. de C.V., and (c) $100,000 in respect of the Rafko Loans.

Part II - Rafko Loans

- 2 -

6.   The Vendor will assign to the Purchaser the Rafko Loans. The consideration for those assignments will be subsumed as part of the purchase price to be paid by the Purchaser under this Agreement.

Part III - Canco debts owed to its Directors

7.   Jack Shuster will deliver on closing a release of the debt owed by Canco to him, i.e., the amount of $175,000.00, for no consideration.

8.   Gordon Fenwick will deliver on closing a release of the debt owed by Canco to him, i.e., the amount of $409,720.00, for no consideration.

9.   Paul Fenwick will deliver on closing a release of the debt owed by Canco to him, i.e., the amount of $306,458.85, for no consideration.

10.  Joel Fenwick will deliver on closing a release of the debt owed by Canco to him, i.e., the amount of $309,767.00, for no consideration.

2

5821707 v2

SCHEDULE "F"
HOLD AGREEMENT

Motorcar Parts of America, Inc.
Hold Agreement

May ___, 2011

Motorcar Parts of America, Inc.
2929 California Street
Torrance, CA 90503
Attention: Michael Umansky, General Counsel

Re:  Motorcar Parts of America, Inc.–Hold Agreement

Dear Sirs:

Pursuant to the Share Purchase Agreement dated May ___, 2011 between FAPL Holdings Inc. (the "**Vendor**") and Motorcar Parts of America, Inc. ("**MPA**") (the "**Share Purchase Agreement**"), it is contemplated that MPA will issue the Vendor's MPA Shares (as defined in the Share Purchase Agreement) to Vendor.  Vendor agrees that during the Hold Period (as defined below), whether or not all or a portion of the MPA Shares are then in the escrow account maintained by the escrow agent pursuant to the Escrow Agreement (as defined in the Share Purchase Agreement), Vendor will (i) not, directly or indirectly, offer, sell, contract to sell, make any short sale, pledge or otherwise dispose of, or enter into any hedging transaction that is likely to result in a transfer of, any of the Vendor's MPA Shares, options to acquire Vendor's MPA Shares or securities exchangeable for or convertible into Vendor's MPA Shares which it may beneficially own (as defined in Rule 13d-3(d)(1) under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")), grant or sell any option to purchase or enter into any agreement to dispose of any of the Vendor's MPA Shares or publicly disclose the intention to take any such action and (ii) enter into such agreement or agreements as MPA shall require in order to cause the offer and issuance of the Vendor's MPA Shares to comply with all applicable Securities Laws (as defined below) and be exempt from the requirements of Section 5 of the Securities Act of 1933, as amended (the "**33 Act**"), and any other comparable requirements of any other applicable Securities Laws including, without limitation, the representation letter attached hereto as Exhibit A. "**Securities Laws**" means:  (i) all federal securities laws of the United States of America, all rules and regulations promulgated in connection with such laws and all governmental orders and decrees issued by any regulatory authority granted to authority to issue orders or decrees pursuant to such laws (collectively, "**US Federal Securities Laws**"); (ii) the rules and regulations of any self-regulatory organization authorized pursuant to the US Federal Securities Laws; (iii) the listing requirements of any exchange on which the shares of MPA Common Stock are listed, including, without limitation, NASDAQ; (iv) all securities laws of any state of the United States of America, all rules and regulations promulgated in connection with such laws and all governmental orders and decrees issued by any regulatory authority granted the authority to issue orders or decrees pursuant to such laws; and (v) all securities laws of any province of Canada, all rules and regulations promulgated

- 2 -

in connection with such laws and all governmental orders and decrees issued by any regulatory authority granted the authority to issue orders or decrees pursuant to such laws.

The foregoing restrictions are expressly agreed to preclude Vendor from engaging in any hedging or other transaction which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of the Vendor's MPA Shares even if the Vendor's MPA Shares would be disposed of by someone other than Vendor. Such prohibited hedging or other transactions would include without limitation any short sale or any purchase, sale or grant of any right (including without limitation any put or call option) with respect to any of the Vendor's MPA Shares or with respect to any security that includes, relates to, or derives any significant part of its value from the Vendor's MPA Shares.

The "Hold Period" shall mean the period commencing on the Closing Date (as defined in the Share Purchase Agreement) and continuing until the eighteen-month anniversary of the Closing Date.

Vendor is and for the duration of the Hold Period will be, the record and beneficial owner of the Vendor's MPA Shares and has and for the duration of the Hold Period will hold (subject to the restrictions set forth herein) the Vendor's MPA Shares, free and clear of all liens, encumbrances, and claims whatsoever except for the restrictions under applicable Securities Laws and the Share Purchase Agreement (including the Schedules and Exhibits thereto). The undersigned also agrees and consents to the entry of stop transfer instructions with MPA's transfer agent and registrar against the transfer of the Vendor's MPA Shares except in compliance with the foregoing restrictions.

In addition to any legends required by applicable Securities Laws, all certificates representing the Vendor's MPA Shares must bear the following legends when delivered at the Closing:

> "The shares represented by this certificate have not been registered with the United States Securities and Exchange Commission or the securities commission of any state and have been issued in reliance upon an exemption from registration under the Securities Act of 1933, as amended (the "Securities Act"), and applicable state securities laws and, accordingly, may not be offered, sold or otherwise transferred except pursuant to an effective registration statement under the Securities Act or pursuant to an available exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and in accordance with applicable state securities laws as evidenced by a legal opinion of counsel to such effect, the substance of which shall be reasonably acceptable to the Corporation.
>
> The shares represented by this certificate are subject to a Hold Agreement, as may be amended from time to time (a copy of which may be obtained upon written request from the

- 3 -

Corporation). The shares represented by this certificate may be transferred only in accordance with the terms of the Hold Agreement."

At any time on or after the completion or termination of the Hold Period, the Vendor may submit the certificate(s) representing the Vendor's MPA Shares to the Purchaser or its transfer agent at the following address:

Continental Stock Transfer & Trust Company
17 Battery Place, 8th Floor
New York, New York 10004
Attn: Michael G. Mullings

and, if the Vendor's MPA Shares are then transferrable by the Vendor as provided under section (b)(1) of Rule 144 under the 33 Act (or any comparable successor provision), the Purchaser and its transfer agent shall promptly (and in any event within 3 business days of receipt of the certificates representing the MPA Shares (the "Share Certificates") and supporting documentation reasonably requested by the Purchaser and/or its transfer agent) remove the stop transfer instructions with respect to the transfer of the Vendor's MPA Shares and issue the Vendor and deliver to the Vendor or its designee, one or more new certificates representing the Vendor's MPA Shares, registered in the Vendor's name and without restrictive legends.  If the Vendor's MPA Shares are not transferrable under the provisions of Rule 144(b)(1) at the time it is submitted to the Purchaser or its transfer agent as provided in this section, and if any other provision of Rule 144 or any other appropriate exemption from registration under the 33 Act is then available for the removal of the transfer restrictions and legends in connection with a specific transfer or disposition of the Vendor's MPA Shares by the Vendor, then upon submission of evidence of compliance with such other provision or exemption by the Vendor reasonably satisfactory to the Purchaser and its transfer agent and delivery of the Share Certificates, the Purchaser and its transfer agent shall promptly remove the stop transfer instructions with respect to the transfer of the Vendor's MPA Shares and issue to Vendor and deliver to Vendor or its designee one or more new certificates representing the Vendor's MPA Shares, registered in the Vendor's name and without restrictive legends.

Vendor understands and agrees that this Agreement is irrevocable and shall be binding upon Vendor's successors, and assigns.

This Agreement may be executed in two counterparts, each of which shall be deemed an original but both of which shall be considered one and the same instrument.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

- 4 -

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflicting provision or rule (whether of the State of New York or any other jurisdiction) that would cause the laws of any jurisdiction other than the State of New York to be applied.   In furtherance of the foregoing, the internal laws of the State of New York will control the interpretation and construction of this Agreement, even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

Very truly yours,

FAPL Holdings, Inc.

By: _____
       Name:
       Title:


Agreed to and Acknowledged:

Motorcar Parts of America, Inc.

By: _____
       Name:
       Title:

EXHIBIT "A" ·

Representation Letter

May __, 2011

Motorcar Parts of America, Inc.
2929 California Street
Torrance, CA 90503

> Re:   Issuance of shares of common stock, par value $0.01 per share (the
> "Common Stock") of Motorcar Parts of America, Inc. (the
> "Company")_____

Ladies and Gentlemen:

In connection with the issuance of 360,000 shares of Common Stock (the "**Shares**") by the Company to the undersigned pursuant to the Share Purchase Agreement by and among the Company, the undersigned and the other party names therein dated as of even date herewith ("**Share Purchase Agreement**"), the undersigned hereby represents to you as follows:

1.  Accredited Investor.  The undersigned is an "accredited investor" as that term is defined in Rule 501 of the General Rules and Regulations under the Securities Act of 1933, as amended (the "**Securities Act**") by reason of Rule 501(a)(3).

2.  Investment Purposes.  The undersigned is acquiring the Shares for the undersigned's own account as principal, not as a nominee or agent, for investment purposes only, and not with a view to, or for, resale, distribution or fractionalization thereof in whole or in part. Further, the undersigned does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares for which the undersigned is subscribing or any part of the Shares.

3.  No General Solicitation.  The undersigned is not receiving the Shares as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or presented at any seminar or meeting, or any solicitation of by person previously not known to the undersigned in connection with investment securities generally.

4.  Investment Experience.  The undersigned is (i) experienced in making investments of the kind similar to the ownership of the Shares, (ii) able, by reason of the business and financial experience of its officers (if an entity) and professional advisors (who are not affiliated with or compensated in any ·way by the Company or any of its affiliates), to protect its own interests in connection with the receipt and ownership of the Shares, and (iii) able to afford the entire loss of its investment in the Shares.

- 2 -

5. <u>Exemption from Registration.</u>  The undersigned acknowledges the undersigned's understanding that the offering and sale of the Shares is intended to be exempt from registration under the Securities Act.  In furtherance thereof, in addition to the other representations and warranties of the undersigned made herein, the undersigned further represents and warrants to and agrees with the Company and its affiliates as follows:

(a)  The undersigned has the financial ability to bear the economic risk of the undersigned's investment, has adequate means for providing for the undersigned's current needs and personal contingencies and has no need for liquidity with respect to the undersigned's investment in the Company; and

(b)  The undersigned has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the prospective ownership of the Shares.  The undersigned also represents it has not been organized for the purpose of acquiring the Shares; and

(c)  The undersigned has been provided an opportunity for a reasonable period of time prior to the date hereof to obtain additional information concerning the offering of the Shares, the Company and all other information to the extent the Company possesses such information or can acquire it without unreasonable effort or expense.

6. <u>Economic Considerations.</u>  The undersigned is not relying on the Company, or its affiliates or agents with respect to economic considerations involved in this investment.  The undersigned has relied solely on its own advisors.

7.  The undersigned consents to the Company making a notation on its records or giving instructions to any transfer agent of the Company in order to implement the restrictions on transfer of the Shares set forth in the Hold Agreement between the undersigned and the Company dated as of even date herewith.

The undersigned represents that the information above is correct and understands that you are relying upon it in issuing the Shares.

Very truly yours,

FAPL HOLDINGS INC.

By: _____

　　　　　Name:

　　　　　Title:

SCHEDULE "G"
CLAIMS

(a)     Automotive Aftermarket Group, LLC has recently alleged a default by Canco in respect of monies owed to AAG relating to equipment purchases made by it from AAG and the matter is before the courts in New Hampshire. The Claim is for $1 million;

(b)     The landlord in respect of the Flo-Pro Inc. premises in New Hampshire has alleged a default by Flo-Pro's failure to provide a replacement letter of credit and has purported to terminate the lease all of which is being litigated and Flo-Pro is seeking a declaration that the landlord's lease termination was unlawful and injunctive relief. No other damages sought;

(c)     Schnair, a former Canco sales representative, has issued a claim against Canco in the amount of $1.2 million. Notwithstanding the amount of the Claim, for the purposes of the indemnity in Section 11 of the Agreement, the indemnifiable amount for this Claim will constitute any payment under this Claim in excess of $250,000;

(d)     Trans-Western Marketing has issued a claim for breach of contract in the amount of $150,000;

(e)     LTD has brought a claim for $358,000 which is a trade payable;

(f)     Dennis Skoreyco is claiming $135,000 for severance;

(g)     Gianzo Mastrangelo is claiming $175,000 for severance; and

(h)     Miscellaneous union grievances aggregating less than $100,000.

SCHEDULE "H"
ESCROW AGREEMENT

**ESCROW AGREEMENT** (this "**Agreement**") dated as of May 5, 2011, among Jack Shuster, Paul Fenwick, Gordon Fenwick and Joel Fenwick (collectively, the "**Principals**"), FAPL Holdings Inc. (the "**Vendor**"), Motorcar Parts of America, Inc. (the "**Purchaser**"), and Stikeman Elliott LLP, as Escrow Agent (the "**Escrow Agent**").

**WHEREAS** pursuant to the Purchase Agreement dated May 5, 2011 among the Vendor, the Purchaser and the Principals (the "**Purchase Agreement**"), the Purchaser has agreed to purchase from the Vendor 10,001,500 common shares of Fenwick Automotive Products Limited, one (1) common share of Introcan Inc. and 500 Series "F" shares of Fapco S.A. de C.V. (the "**Purchased Shares**") and certain loans payable to the Vendor (the "**Purchased Loans**");

**AND WHEREAS**, pursuant to the Purchase Agreement, the purchase price for the Purchased Shares and Purchased Loans shall be satisfied by the Purchaser delivering to the Vendor 360,000 common shares in the capital of the Purchaser (the "**Escrowed Shares**");

**AND WHEREAS** the Escrowed Shares to be issued to the Vendor at the Closing of the transactions contemplated by the Purchase Agreement shall be held in escrow and released to the Vendor after a certain period of time, subject to certain conditions;

**AND WHEREAS** it is a condition to the consummation of the transactions contemplated by the Purchase Agreement that the parties hereto enter into this Agreement;

**AND WHEREAS** the Escrow Agent is willing to act as escrow agent for the sole purpose of accepting, holding and distributing the Escrowed Shares in accordance with this Agreement.

**NOW THEREFORE**, as a condition to the completion of the transactions contemplated by the Purchase Agreement, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereby agree as follows:

ARTICLE 1
GENERAL

**1.1**   **Definitions**

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Purchase Agreement.

ARTICLE 2
ESCROW OF SHARES FOR INDEMNIFICATION

**2.1**   **Release of Escrowed Shares re Indemnity**

5821707 v2

- 2 -

Subject to Section 2.2, within three (3) Business Days of delivery by the Purchaser of notice in writing (the "**Indemnity Notice**") to the Escrow Agent with a copy to the Vendor and the Principals certifying:

(i)      the amount payable to the Indemnified Person in respect of a Third Party Claim or Direct Claim as determined pursuant to Sections 11, 13, and 14 of the Purchase Agreement (the "**Indemnity Payment**"); and

(ii)      that the Indemnified Parties have not elected to satisfy the Indemnity Payment in cash in lieu of the purchase for cancellation or redemption of Escrowed Shares pursuant to this Agreement and the Purchase Agreement,

the Escrow Agent shall deliver to the Purchaser share certificates, together with duly executed stock transfer powers of attorney for such shares, representing Escrowed Shares that have a Market Value calculated as of the earlier of (i) the last day of the six (6) month period referred to in Section 13 of the Purchase Agreement and (ii) the date upon which the Indemnifying Parties notify the Purchaser in writing that they will not exercise their option to satisfy any indemnifiable claims in cash in lieu of the redemption or purchase for cancellation of Escrowed Shares.

"Market Value", for the purpose of this Agreement, means the volume weighted average trading price of the common stock of the Purchaser (the "MPA Shares") on the NASDAQ (or the principal trading market on which the MPA Shares are listed at such time) for the immediately preceding 20 trading days.

**2.2**      **Release of Escrowed Shares on Expiration Date**

(a)      Within two (2) Business Days after the date that is eighteen (18) months following the Closing of the transactions contemplated by the Purchase Agreement (the "**Expiration Date**"), the Purchaser shall deliver a notice in writing to the Escrow Agent, with a copy to the Vendor and the Principals, certifying that the expiration of the Purchaser's rights to any Indemnity Payment has occurred (the "**Expiration Notice**"). On the fifth Business Day immediately following receipt of such notice, the Escrow Agent shall deliver or cause to be delivered to the Vendor share certificates representing any remaining Escrowed Shares registered in the name of the Vendor (or as the Vendor may otherwise direct); unless, before the Expiration Date, the Purchaser has delivered a notice in writing (a "**Notice of Claim**") to the Escrow Agent, with a copy to Vendor and the Principals, certifying that there is outstanding a Third Party Claim or Direct Claim for which the Purchaser has sought indemnification pursuant to Sections 11, 13 and 14 of the Purchase Agreement. If the Purchaser has not delivered an Expiration Notice as aforesaid by the close of business (Toronto time) on the Expiration Date, or if the Purchaser has not delivered a Notice of Claim by the close of business (Toronto time) on the Business Day immediately preceding the Expiration

- 3 -

Date, the Purchaser shall be deemed to have delivered an Expiration Notice on the Expiration Date.

(b)     Subject to Section 2.3, if the Escrow Agent receives a Notice of Claim before the Expiration Date, the Escrow Agent shall continue to hold the Escrowed Shares and shall only release them in accordance with:

(i)     Section 2.1; or

(ii)    Section 2.2(a), *mutatis mutandis*, provided that the Escrow Agent has received a notice in writing (the "**Release Notice**") from the Purchaser (a copy of which the Purchaser has delivered to the Vendor and the Principals) certifying that the matters referred to in the Notice of Claim have been resolved and (i) no amount is payable by the Vendor or the Principals pursuant to Sections 11, 13 and 14 of the Purchase Agreement in respect of such matters, or (ii) the Market Value of the Escrowed Shares (at the Expiration Date) is greater than 1.2 times the amount payable by the Vendor or the Principals, as the case may be, pursuant to Sections 11, 13 and 14 of the Purchase Agreement in respect of such matters. In the case of this subsection 2.2(b)(ii)(ii), the number of Escrowed Shares that shall be released to the Vendor shall be only the Escrowed Shares in excess of the number of Escrowed Shares having a Market Value at the Expiration Date of 1.2 times the maximum amount payable pursuant to the outstanding Direct Claim or Third Party Claim.

(c)     The Purchaser shall deliver the Release Notice to the Escrow Agent, the Vendor and the Principals within two (2) Business Days of the matters referred to in the Notice of Claim being resolved if, in accordance with such resolution, no amount is payable by the Vendor or the Principals pursuant to pursuant to Sections 11, 13 and 14 of the Purchase Agreement or the amount that is so payable by the Vendor or the Principals in respect of the matters referred to in the Notice of Claim is less than the Market Value of the Escrowed Shares (and only in respect of such excess amount).

2.3     Option Sale

(a)     In the event that the Purchaser delivers a Notice of Claim to the Escrow Agent pursuant to Section 2.2(a) which results in the Escrowed Shares being held in escrow beyond the Expiration Date, each Principal shall have the option to deliver, from time to time, a notice in writing to the Escrow Agent (the "**Option Notice**"), with a copy to the Vendor, the Purchaser and the other Principals, instructing the Escrow Agent to sell up to 90,000 Escrowed Shares (the "**Option Sale**") in aggregate, and the Escrow Agent shall sell or cause to be sold the number of Escrowed Shares specified in the Option Notice over the facilities of the NASDAQ (or the principal trading market on which the MPA Shares are listed at such time) in accordance with the written instructions of the Vendor. In the event of any ambiguity in such instructions

- 4 -

or inability to execute in accordance with such instructions, the Escrow Agent shall not dispose of any such Escrowed Securities.  Any commissions or other charges incurred in connection with such sales shall be borne by the Vendor.

(b)     The Escrow Agent shall not be liable for any action taken or omitted by it in carrying out the Option Sale, or any action suffered by it to be taken or omitted, in good faith, and in the exercise of its best judgment, and shall not be held liable for any error in judgment made in good faith, unless it shall be proved that the Escrow Agent was grossly negligent or acted intentionally in bad faith.

(c)     The proceeds of any such Option Sale (less any commissions and expenses) (the "**Escrowed Proceeds**") shall, until such time as the Escrowed Proceeds are distributed by the Escrow Agent as provided herein, be subject to this Agreement as substitute property for the Escrowed Shares subject to the Option Notice and shall be invested in an interest bearing account (or other interest bearing instruments or deposits with) of a Canadian chartered bank to be jointly selected by the Purchaser and the Principal or in any other mutually agreed upon investments.

(d)     The Escrowed Proceeds shall be released by the Escrow Agent in accordance with Sections 2.1 and 2.2, *mutatis mutandis* (provided that for the purposes of calculating the Market Value of the Escrowed Shares, the Escrowed Proceeds deposited in lieu of the Escrowed Shares shall be valued at the face value of such proceeds without reference to a 1.2 times multiple where otherwise contemplated hereby).

**2.4     Distribution by Mutual Agreement or Court Order**

Notwithstanding any of the foregoing provisions of this Agreement, the Escrow Agent shall deliver or distribute certificates representing all or any portion of the Escrowed Shares (or the Escrowed Proceeds, as the case may be) in accordance with (i) any written notice executed and delivered by the Vendor, the Purchaser and the Principals or (ii) receipt of a final court order, decree or judgment otherwise ordering or directing a release of the Escrowed Shares (or the Escrowed Proceeds, as the case may be), in accordance with such order, decree or judgment.

**ARTICLE 3
Voting Rights and Dividends**

**3.1     Voting Rights or Dividends**

Until such time as the Escrowed Shares are released from escrow, unless the Vendor, Purchaser and Principals otherwise instruct the Escrow Agent in writing:

(i)     All voting rights attached to the Escrowed Shares will at all times be exercised by the registered owner of the Escrowed Shares; and

- 5 -

(ii)   Any dividends received by the Escrow Agent in respect of the Escrowed Shares will be paid or transferred to the Vendor.

## ARTICLE 4
## ESCROW AGENT

4.1   **Duties and Liabilities of Escrow Agent**

(a)   The Escrow Agent shall have no duties or responsibilities other than those expressly set forth in this Agreement, and no additional implied duties or obligations shall be read into this Agreement against the Escrow Agent. The Escrow Agent shall have no duty to enforce any obligation of any Person, other than as provided herein.

(b)   The Escrow Agent shall not be liable for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith, and in the exercise of its best judgment, and shall not be held liable for any error in judgment made in good faith, unless it shall be proved that the Escrow Agent was negligent in ascertaining the pertinent facts or acted intentionally in bad faith.

(c)   The Escrow Agent may rely, and shall be protected in acting, upon any judgment, order, notice, demand, direction, certificate, or other instrument, paper or document which may be submitted to it in connection with its duties hereunder and the directions incorporated therein and which is believed by the Escrow Agent to be genuine and signed or presented by the proper Person(s), and may accept the same as sufficient evidence of the facts stated therein. The Escrow Agent shall in no way be bound to call for further evidence (whether as to due execution, validity or effectiveness, or the jurisdiction of any court, or as to the truth of any fact), and shall not be responsible for any loss that may be occasioned by its failing to do so.

(d)   In the event that the Escrow Agent shall become involved in any arbitration or litigation relating to the Escrowed Shares or the Escrowed Proceeds, as the case may be, the Escrow Agent is authorized to comply with any decision reached through such arbitration or litigation.

(e)   In the event that a dispute should arise with respect to this Agreement, which results in an adverse claim or demand being made upon the Escrowed Shares or the Escrowed Proceeds, as the case may be, or in the event that the Escrow Agent, in good faith, is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, (i) file an application or motion in interpleader in a court of competent jurisdiction, (ii) refuse to comply with any claims or demands on it, (iii) refuse to take any other action hereunder, so long as such dispute shall continue or such doubt shall exist or (iv) pay into court or otherwise deposit the Escrowed Shares or the Escrowed Proceeds, as the case may be, with a court of competent jurisdiction in the Province of Ontario. Upon the Escrow Agent so depositing the Escrowed

- 6 -

Shares or the Escrowed Proceeds, as the case may be, it shall be discharged and released of its duties and obligations hereunder. The Escrow Agent shall be entitled to continue to refrain from acting until (a) the rights of all the parties have been fully and finally adjudicated by the final order, decree or judgment of a court of competent jurisdiction in the province of Ontario (the time for appeal having expired with no appeal having been taken), or (b) all differences shall have been settled and all doubt resolved by agreement among all of the interested persons, and in each case the Escrow Agent shall have been notified thereof in writing signed by the Parties.

(f)     The parties hereto acknowledge and agree that notwithstanding that Stikeman Elliott LLP is acting as Escrow Agent hereunder, Stikeman Elliott LLP shall be entitled to act or continue to act and shall not be disqualified from acting or continuing to act as legal counsel for the Purchaser or any corporation or corporations forming part of the Purchaser both while it is acting as Escrow Agent hereunder and thereafter.

**4.2     Escrow Agent's Fees, Expenses and Disbursements**

The Purchaser agrees to pay the reasonable fees, expenses and disbursements incurred by the Escrow Agent in connection with the performance of its obligations hereunder. Under no circumstances will the Vendor or any of the Principals be liable to the Escrow Agent in respect of its fees, expenses and disbursements hereunder.

**4.3     Indemnification of Escrow Agent**

The Vendor and the Purchaser will jointly and severally keep the Escrow Agent indemnified at all times against all actions, proceedings, losses, liabilities, costs, claims and demands incurred or sustained by the Escrow Agent in respect of any matter or thing done by it under, pursuant to or in connection with this Agreement, or otherwise arising in connection with its office as Escrow Agent hereunder, except in so far as the same arose through gross negligence or wilful misconduct on the part of the Escrow Agent or otherwise arose from any breach by it of its obligations under this Agreement. Without limiting the generality of the foregoing, the Vendor, the Purchaser and the Principals will indemnify the Escrow Agent against all legal or other fees arising out of or in connection with its entering into this Agreement and carrying out its duties hereunder, including without limitation the costs and expenses of defending itself against any claim of liability or any action for interpleader. This indemnity shall survive the termination or discharge of this Agreement or the resignation of the Escrow Agent.

**4.4     Resignation, Removal of Escrow Agent**

(a)     The Escrow Agent may resign its trust and be discharged from all further duties and liabilities hereunder after giving fifteen days' written notice to the Parties or such shorter notice as the Parties may accept as sufficient, and may be removed from its office as such Escrow Agent by the Parties jointly at any time by not less than five Business Days' written notice given to the Escrow Agent. Upon discharge or removal, the Escrow Agent shall deliver the

- 7 -

Escrowed Shares or the Escrowed Proceeds, as the case may be, as directed by the Parties.

(b)     In the event of the resignation of the Escrow Agent or its removal from office, the Parties shall appoint a successor escrow agent which shall be either (i) a trust company that carries on business in Canada or (ii) a partnership of barristers and solicitors not having less than 50 members and an office in the City of Toronto.   The Parties acknowledge that the Escrow Agent has indicated its intention to be replaced as escrow agent hereunder shortly following the Closing.

(c)     The Escrow Agent which resigns or is removed shall execute such further assurances or documents as, in the opinion of the Parties, may be necessary or desirable to vest in the new escrow agent the same powers, rights, duties and responsibilities as if the new escrow agent had been originally named as Escrow Agent.

## ARTICLE 5
## MISCELLANEOUS

### 5.1   Notices

Any notice, direction or other communication to be given under this escrow agreement shall be in writing and given by delivering it or sending it by facsimile or other similar form of recorded communication addressed:

(i)     to the Purchaser at:

2929 California Street
Torrance CA 90503
United States of America

Attention:       Michael M. Umansky
Telephone:      (310) 972-4015
Facsimile:       (310) 943-1630

with a copy (that does not constitute notice) to:

Stikeman Elliott LLP
Barristers & Solicitors
5300 Commerce Court West,
199 Bay Street,
Toronto, ON
M5L 1B9
Canada

- 8 -

Attention:    David Weinberger
Telephone:  (416) 869-5515
Facsimile:  (416) 947-0866

(ii)    to the Vendor at:

c/o Wisebrod/Zeliger Associates
Barristers & Solicitors, Notaries
245 Fairview Mall Drive
Suite 510
Toronto, ON
M2J 4T1

Attention:    Avi Wisebrod
Telephone:  (416) 496-2600 x 201
Facsimile:  (416) 496-1708

(iii)    to the Escrow Agent at:

Stikeman Elliott LLP
Barristers & Solicitors
5300 Commerce Court West,
199 Bay Street,
Toronto, ON
M5L 1B9
Canada

Attention:    David Weinberger
Telephone:  (416) 869-5515
Facsimile:  (416) 947-0866

(iv)    to Gordon Fenwick at:

475 Spadina Road
Toronto, ON
M5P 2W6

(v)    to Paul Fenwick at:

125 Bedford Road
Toronto, ON
M5R 2K6

(vi)    to Joel Fenwick at:

28 Ridge Hill Drive
Toronto, ON
M6G 3A3

- 9 -

(vii)   to Jack Shuster at:

48 King Cross Avenue
Richmond Hill, ON
L4B 2S9

Any such communication shall be deemed to have been validly and effectively given (i) if personally delivered, on the date of such delivery, if such date is a Business Day and such delivery was made prior to 4:00 p.m. (Toronto time), otherwise on the next Business Day, and (ii) if transmitted by facsimile or similar means of recorded communication, on the Business Day following the date of transmission.  Any party may change its address for service from time to time by notice given in accordance with the foregoing, and any subsequent notice shall be sent to such party at its changed address.

### 5.2    Entire Agreement

This Agreement, together with the Purchase Agreement, sets forth the entire agreement among the Parties with respect to the matters contained herein.  In the event of any conflict, the provisions of this Agreement shall prevail.

### 5.3    Enurement and Assignment

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and assigns.

### 5.4    Severability

If any provision of this Agreement is deemed by any court of competent jurisdiction to be invalid or void, the remaining provisions shall remain in full force and effect.

### 5.5    Waiver

No failure or delay of the Escrow Agent in exercising any right, power or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any right, power or remedy preclude any other or further exercise of any right, power or remedy.

### 5.6    Further Assurance

Each of the Parties shall, at the request of the other Parties, deliver to the requesting party all further documents or other assurances as may reasonably be necessary or desirable to give effect to this Agreement.

### 5.7    Time

Time shall be of the essence in respect of this Agreement.

### 5.8    Governing Law

582:1707 v2

- 10 -

This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein without reference to any choice of law principles. Each Party irrevocably attorns and submits to the exclusive jurisdiction of the Ontario courts situated in the City of Toronto, and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

5.9     Counterparts

This Agreement may be executed in several counterparts, each of which so executed shall be deemed an original, and all of which shall constitute one and the same instrument.

*[Remainder of page left intentionally blank]*

- 11 -

IN WITNESS WHEREOF the Parties have executed this Escrow Agreement.

FAPL HOLDINGS INC.

By: _____

Name:

Title:

MOTORCAR PARTS OF AMERICA, INC.

By: _____

Name:

Title:

_____          _____
Witness                                                         Joel Fenwick


_____          _____
Witness                                                         Jack Shuster


_____          _____
Witness                                                         Gordon Fenwick


_____          _____
Witness                                                         Paul Fenwick

5821707 v2

- 12 -

STIKEMAN ELLIOTT LLP

By:  _____
         Authorized Signing Officer

**EXHIBIT B**

**Motorcar Parts of America, Inc.**
**Hold Agreement**

May __6__, 2011

Motorcar Parts of America, Inc.
2929 California Street
Torrance, CA 90503
Attention: Michael Umansky, General Counsel

      Re:  Motorcar Parts of America, Inc.–Hold Agreement

Dear Sirs:

      Pursuant to the Share Purchase Agreement dated May __6__, 2011 between FAPL Holdings Inc. (the "**Vendor**") and Motorcar Parts of America, Inc. ("**MPA**") (the "**Share Purchase Agreement**"), it is contemplated that MPA will issue the Vendor's MPA Shares (as defined in the Share Purchase Agreement) to Vendor. Vendor agrees that during the Hold Period (as defined below), Vendor will (i) not, directly or indirectly, offer, sell, contract to sell, make any short sale, pledge or otherwise dispose of, or enter into any hedging transaction that is likely to result in a transfer of, any of the Vendor's MPA Shares, options to acquire Vendor's MPA Shares or securities exchangeable for or convertible into Vendor's MPA Shares which it may beneficially own (as defined in Rule 13d-3(d)(1) under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")), grant or sell any option to purchase or enter into any agreement to dispose of any of the Vendor's MPA Shares or publicly disclose the intention to take any such action and (ii) enter into such agreement or agreements as MPA shall require in order to cause the offer and issuance of the Vendor's MPA Shares to comply with all applicable Securities Laws (as defined below) and be exempt from the requirements of Section 5 of the Securities Act of 1933, as amended (the "**33 Act**"), and any other comparable requirements of any other applicable Securities Laws including, without limitation, the representation letter attached hereto as Exhibit A. "**Securities Laws**" means: (i) all federal securities laws of the United States of America, all rules and regulations promulgated in connection with such laws and all governmental orders and decrees issued by any regulatory authority granted to authority to issue orders or decrees pursuant to such laws (collectively, "**US Federal Securities Laws**"); (ii) the rules and regulations of any self-regulatory organization authorized pursuant to the US Federal Securities Laws; (iii) the listing requirements of any exchange on which the shares of MPA Common Stock are listed, including, without limitation, NASDAQ; (iv) all securities laws of any state of the United States of America, all rules and regulations promulgated in connection with such laws and all governmental orders and decrees issued by any regulatory authority granted the authority to issue orders or decrees pursuant to such laws; (v) all federal securities laws of Canada, all rules and regulations promulgated in connection with such laws and all

Motorcar Parts of America, Inc.
May___, 2011
Page 2 of 8

governmental orders and decrees issued by any regulatory authority granted the authority to issue orders or decrees pursuant to such laws; and (vi) all securities laws of any province of Canada, all rules and regulations promulgated in connection with such laws and all governmental orders and decrees issued by any regulatory authority granted the authority to issue orders or decrees pursuant to such laws

The foregoing restrictions are expressly agreed to preclude Vendor from engaging in any hedging or other transaction which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of the Vendor's MPA Shares even if the Vendor's MPA Shares would be disposed of by someone other than Vendor. Such prohibited hedging or other transactions would include without limitation any short sale or any purchase, sale or grant of any right (including without limitation any put or call option) with respect to any of the Vendor's MPA Shares or with respect to any security that includes, relates to, or derives any significant part of its value from the Vendor's MPA Shares.

The "**Hold Period**" shall mean the period commencing on the Closing Date (as defined in the Share Purchase Agreement) and continuing until the eighteen-month anniversary of the Closing Date.

Vendor is and for the duration of the Hold Period will be, the record and beneficial owner of the Vendor's MPA Shares and has and for the duration of the Hold Period will hold (subject to the restrictions set forth herein) the Vendor's MPA Shares, free and clear of all liens, encumbrances, and claims whatsoever except for the restrictions under applicable Securities Laws and the Share Purchase Agreement (including the Schedules and Exhibits thereto). The undersigned also agrees and consents to the entry of stop transfer instructions with MPA's transfer agent and registrar against the transfer of the Vendor's MPA Shares except in compliance with the foregoing restrictions.

In addition to any legends required by applicable Securities Laws, all certificates representing the Vendor's MPA Shares must bear the following legends when delivered at the Closing:

> "The shares represented by this certificate have not been registered with the United States Securities and Exchange Commission or the securities commission of any state and have been issued in reliance upon an exemption from registration under the Securities Act of 1933, as amended (the "Securities Act"), and applicable state securities laws and, accordingly, may not be offered, sold or otherwise transferred except pursuant to an effective registration statement under the Securities Act or pursuant to an

Motorcar Parts of America, Inc.
May___, 2011
Page 3 of 8

> available exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and in accordance with applicable state securities laws as evidenced by a legal opinion of counsel to such effect, the substance of which shall be reasonably acceptable to the Corporation.

> The shares represented by this certificate are subject to a Hold Agreement, as may be amended from time to time (a copy of which may be obtained upon written request from the Corporation). The shares represented by this certificate may be transferred only in accordance with the terms of the Hold Agreement."

At any time on or after the completion or termination of the Hold Period, the Vendor may submit the certificate(s) representing the Vendor's MPA Shares to the Purchaser or its transfer agent at the following address:

> Continental Stock Transfer & Trust Company
> 17 Battery Place, 8th Floor
> New York, New York 10004
> Attn: Michael G. Mullings

and, if the Vendor's MPA Shares are then transferrable by the Vendor as provided under section (b)(1) of Rule 144 under the 33 Act (or any comparable successor provision), the Purchaser and its transfer agent shall promptly (and in any event within 3 business days of receipt of the certificates representing the MPA Shares (the "**Share Certificates**") and supporting documentation reasonably requested by the Purchaser and/or its transfer agent) remove the stop transfer instructions with respect to the transfer of the Vendor's MPA Shares and issue the Vendor and deliver to the Vendor or its designee, one or more new certificates representing the Vendor's MPA Shares, registered in the Vendor's name and without restrictive legends. If the Vendor's MPA Shares are not transferrable under the provisions of Rule 144(b)(1) at the time it is submitted to the Purchaser or its transfer agent as provided in this section, and if any other provision of Rule 144 or any other appropriate exemption from registration under the 33 Act is then available for the removal of the transfer restrictions and legends in connection with a specific transfer or disposition of the Vendor's MPA Shares by the Vendor, then upon submission of evidence of compliance with such other provision or exemption by the Vendor reasonably satisfactory to the Purchaser and its transfer agent and delivery of the Share Certificates, the Purchaser and its transfer agent shall promptly remove the stop transfer instructions with respect to the transfer of the Vendor's MPA Shares and issue to Vendor and deliver to Vendor or its designee one or more new certificates representing the Vendor's MPA Shares, registered in the Vendor's name and without restrictive legends.

Motorcar Parts of America, Inc.
May___, 2011
Page 4 of 8


Vendor understands and agrees that this Agreement is irrevocable and shall be binding upon Vendor's successors, and assigns.

This Agreement may be executed in two counterparts, each of which shall be deemed an original but both of which shall be considered one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Motorcar Parts of America, Inc.
May___, 2011
Page 5 of 8

      This Agreement will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflicting provision or rule (whether of the State of New York or any other jurisdiction) that would cause the laws of any jurisdiction other than the State of New York to be applied.  In furtherance of the foregoing, the internal laws of the State of New York will control the interpretation and construction of this Agreement, even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

            Very truly yours,

            FAPL Holdings, Inc.

            By: _____
               Name:
               Title:

Agreed to and Acknowledged:

Motorcar Parts of America, Inc.

By:_____
     Name:
     Title:

Motorcar Parts of America, Inc.
May___, 2011
Page 5 of 8


   This Agreement will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflicting provision or rule (whether of the State of New York or any other jurisdiction) that would cause the laws of any jurisdiction other than the State of New York to be applied. In furtherance of the foregoing, the internal laws of the State of New York will control the interpretation and construction of this Agreement, even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.


        Very truly yours,

         FAPL Holdings, Inc.

      By: _____
         Name:
         Title:


Agreed to and Acknowledged:

Motorcar Parts of America, Inc.

By: _____
  Name:
  Title:

Exhibit A

Representation Letter

May 6, 2011

Motorcar Parts of America, Inc.
2929 California Street
Torrance, CA 90503

    **Re:**  **Issuance of shares of common stock, par value $0.01 per share
(the "Common Stock") of Motorcar Parts of America, Inc. (the
"Company")**

Ladies and Gentlemen:

In connection with the issuance of 360,000 shares of Common Stock (the "**Shares**") by the
Company to the undersigned pursuant to the Share Purchase Agreement by and among the
Company, the undersigned and the other party names therein dated as of even date
herewith ("**Share Purchase Agreement**"), the undersigned hereby represents to you as
follows:

1. <u>Accredited Investor</u>. The undersigned is an "accredited investor" as that term is
defined in Rule 501 of the General Rules and Regulations under the Securities
Act of 1933, as amended (the "**Securities Act**") by reason of Rule 501(a)(3).

2. <u>Investment Purposes</u>. The undersigned is acquiring the Shares for the
undersigned's own account as principal, not as a nominee or agent, for
investment purposes only, and not with a view to, or for, resale, distribution or
fractionalization thereof in whole or in part. Further, the undersigned does not
have any contract, undertaking, agreement or arrangement with any person to
sell, transfer or grant participations to such person or to any third person, with
respect to the Shares for which the undersigned is subscribing or any part of the
Shares.

3. <u>No General Solicitation</u>. The undersigned is not receiving the Shares as a result
of or subsequent to any advertisement, article, notice or other communication
published in any newspaper, magazine or similar media or broadcast over
television or radio, or presented at any seminar or meeting, or any solicitation of

by person previously not known to the undersigned in connection with investment securities generally.

4. <u>Investment Experience</u>. The undersigned is (i) experienced in making investments of the kind similar to the ownership of the Shares, (ii) able, by reason of the business and financial experience of its officers (if an entity) and professional advisors (who are not affiliated with or compensated in any way by the Company or any of its affiliates), to protect its own interests in connection with the receipt and ownership of the Shares, and (iii) able to afford the entire loss of its investment in the Shares.

5. <u>Exemption from Registration</u>. The undersigned acknowledges the undersigned's understanding that the offering and sale of the Shares is intended to be exempt from registration under the Securities Act. In furtherance thereof, in addition to the other representations and warranties of the undersigned made herein, the undersigned further represents and warrants to and agrees with the Company and its affiliates as follows:

   a. The undersigned has the financial ability to bear the economic risk of the undersigned's investment, has adequate means for providing for the undersigned's current needs and personal contingencies and has no need for liquidity with respect to the undersigned's investment in the Company; and

   b. The undersigned has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the prospective ownership of the Shares. The undersigned also represents it has not been organized for the purpose of acquiring the Shares; and

   c. The undersigned has been provided an opportunity for a reasonable period of time prior to the date hereof to obtain additional information concerning the offering of the Shares, the Company and all other information to the extent the Company possesses such information or can acquire it without unreasonable effort or expense.

6. <u>Economic Considerations</u>. The undersigned is not relying on the Company, or its affiliates or agents with respect to economic considerations involved in this investment. The undersigned has relied solely on its own advisors.

7. The undersigned consents to the Company making a notation on its records or giving instructions to any transfer agent of the Company in order to implement the restrictions on transfer of the Shares set forth in the Hold Agreement between the undersigned and the Company dated as of even date herewith.

The undersigned represents that the information above is correct and understands that you are relying upon it in issuing the Shares.

Very truly yours,

FAPL HOLDINGS INC.

By: _____
Name:
Title:

**EXHIBIT C**

## ESCROW AGREEMENT

**ESCROW AGREEMENT** (this "**Agreement**") dated as of May 6, 2011, among Jack Shuster, Paul Fenwick, Gordon Fenwick and Joel Fenwick (collectively, the "**Principals**"), FAPL Holdings Inc. (the "**Vendor**"), Motorcar Parts of America, Inc. (the "**Purchaser**"), and Stikeman Elliott LLP, as Escrow Agent (the "**Escrow Agent**").

**WHEREAS** pursuant to the Purchase Agreement dated May 6, 2011 among the Vendor, the Purchaser and the Principals (the "**Purchase Agreement**"), the Purchaser has agreed to purchase from the Vendor 10,001,500 common shares of Fenwick Automotive Products Limited, one (1) common share of Introcan Inc. and 500 Series "F" shares of Fapco S.A. de C.V. (the "**Purchased Shares**") and certain loans payable to the Vendor (the "**Purchased Loans**");

**AND WHEREAS**, pursuant to the Purchase Agreement, the purchase price for the Purchased Shares and Purchased Loans shall be satisfied by the Purchaser delivering to the Vendor 360,000 common shares in the capital of the Purchaser (the "**Escrowed Shares**");

**AND WHEREAS** the Escrowed Shares to be issued to the Vendor at the Closing of the transactions contemplated by the Purchase Agreement shall be held in escrow and released to the Vendor after a certain period of time, subject to certain conditions;

**AND WHEREAS** it is a condition to the consummation of the transactions contemplated by the Purchase Agreement that the parties hereto enter into this Agreement;

**AND WHEREAS** the Escrow Agent is willing to act as escrow agent for the sole purpose of accepting, holding and distributing the Escrowed Shares in accordance with this Agreement.

**NOW THEREFORE**, as a condition to the completion of the transactions contemplated by the Purchase Agreement, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## GENERAL

### 1.1   Definitions

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Purchase Agreement.

## ARTICLE 2
## ESCROW OF SHARES FOR INDEMNIFICATION

### 2.1   Release of Escrowed Shares re Indemnity

(a)   Subject to Section 2.2, within three (3) Business Days of delivery by the Purchaser of notice in writing (the "**Indemnity Notice**") to the Escrow Agent with a copy to the Vendor and the Principals certifying:

Subject to Section 2.2, within three (3) Business Days of delivery by the Purchaser of notice in writing (the "**Indemnity Notice**") to the Escrow Agent with a copy to the Vendor and the Principals certifying:

(i)     the amount payable to the Indemnified Person in respect of a Third Party Claim or Direct Claim as determined pursuant to Sections 11, 13, and 14 of the Purchase Agreement (the "**Indemnity Payment**"); and

(ii)    that the Indemnified Parties have not elected to satisfy the Indemnity Payment in cash in lieu of the purchase for cancellation or redemption of Escrowed Shares pursuant to this Agreement and the Purchase Agreement,

the Escrow Agent shall deliver to the Purchaser share certificates, together with duly executed stock transfer powers of attorney for such shares, representing Escrowed Shares that have a Market Value calculated as of the earlier of (i) the last day of the six (6) month period referred to in Section 13 of the Purchase Agreement and (ii) the date upon which the Indemnifying Parties notify the Purchaser in writing that they will not exercise their option to satisfy any indemnifiable claims in cash in lieu of the redemption or purchase for cancellation of Escrowed Shares.

"**Market Value**", for the purpose of this Agreement, means the volume weighted average trading price of the common stock of the Purchaser (the "**MPA Shares**") on the NASDAQ (or the principal trading market on which the MPA Shares are listed at such time) for the immediately preceding 20 trading days.

2.2     **Release of Escrowed Shares on Expiration Date**

(a)     Within two (2) Business Days after the date that is eighteen (18) months following the Closing of the transactions contemplated by the Purchase Agreement (the "**Expiration Date**"), the Purchaser shall deliver a notice in writing to the Escrow Agent, with a copy to the Vendor and the Principals, certifying that the expiration of the Purchaser's rights to any Indemnity Payment has occurred (the "**Expiration Notice**"). On the fifth Business Day immediately following receipt of such notice, the Escrow Agent shall deliver or cause to be delivered to the Vendor share certificates representing any remaining Escrowed Shares registered in the name of the Vendor (or as the Vendor may otherwise direct); unless, before the Expiration Date, the Purchaser has delivered a notice in writing (a "**Notice of Claim**") to the Escrow Agent, with a copy to Vendor and the Principals, certifying that there is outstanding a Third Party Claim or Direct Claim for which the Purchaser has sought indemnification pursuant to Sections 11, 13 and 14 of the Purchase Agreement. If the Purchaser has not delivered an Expiration Notice as aforesaid by the close of business (Toronto time) on the Expiration Date, or if the Purchaser has not delivered a Notice of Claim by the close of business (Toronto time) on the Business Day immediately preceding the Expiration

Date, the Purchaser shall be deemed to have delivered an Expiration Notice on the Expiration Date.

(b)     Subject to Section 2.3, if the Escrow Agent receives a Notice of Claim before the Expiration Date, the Escrow Agent shall continue to hold the Escrowed Shares and shall only release them in accordance with:

(i)     Section 2.1; or

(ii)    Section 2.2(a), *mutatis mutandis*, provided that the Escrow Agent has received a notice in writing (the "**Release Notice**") from the Purchaser (a copy of which the Purchaser has delivered to the Vendor and the Principals) certifying that the matters referred to in the Notice of Claim have been resolved and (i) no amount is payable by the Vendor or the Principals pursuant to Sections 11, 13 and 14 of the Purchase Agreement in respect of such matters, or (ii) the Market Value of the Escrowed Shares (at the Expiration Date) is greater than 1.2 times the amount payable by the Vendor or the Principals, as the case may be, pursuant to Sections 11, 13 and 14 of the Purchase Agreement in respect of such matters. In the case of this subsection 2.2(b)(ii)(ii), the number of Escrowed Shares that shall be released to the Vendor shall be only the Escrowed Shares in excess of the number of Escrowed Shares having a Market Value at the Expiration Date of 1.2 times the maximum amount payable pursuant to the outstanding Direct Claim or Third Party Claim.

(c)     The Purchaser shall deliver the Release Notice to the Escrow Agent, the Vendor and the Principals within two (2) Business Days of the matters referred to in the Notice of Claim being resolved if, in accordance with such resolution, no amount is payable by the Vendor or the Principals pursuant to pursuant to Sections 11, 13 and 14 of the Purchase Agreement or the amount that is so payable by the Vendor or the Principals in respect of the matters referred to in the Notice of Claim is less than the Market Value of the Escrowed Shares (and only in respect of such excess amount).

2.3     **Option Sale**

(a)     In the event that the Purchaser delivers a Notice of Claim to the Escrow Agent pursuant to Section 2.2(a) which results in the Escrowed Shares being held in escrow beyond the Expiration Date, each Principal shall have the option to deliver, from time to time, a notice in writing to the Escrow Agent (the "**Option Notice**"), with a copy to the Vendor, the Purchaser and the other Principals, instructing the Escrow Agent to sell up to 90,000 Escrowed Shares (the "**Option Sale**") in aggregate, and the Escrow Agent shall sell or cause to be sold the number of Escrowed Shares specified in the Option Notice over the facilities of the NASDAQ (or the principal trading market on which the MPA Shares are listed at such time) in accordance with the written instructions of the Vendor. In the event of any ambiguity in such instructions

or inability to execute in accordance with such instructions, the Escrow Agent shall not dispose of any such Escrowed Securities.  Any commissions or other charges incurred in connection with such sales shall be borne by the Vendor.

(b)     The Escrow Agent shall not be liable for any action taken or omitted by it in carrying out the Option Sale, or any action suffered by it to be taken or omitted, in good faith, and in the exercise of its best judgment, and shall not be held liable for any error in judgment made in good faith, unless it shall be proved that the Escrow Agent was grossly negligent or acted intentionally in bad faith.

(c)     The proceeds of any such Option Sale (less any commissions and expenses) (the "Escrowed Proceeds") shall, until such time as the Escrowed Proceeds are distributed by the Escrow Agent as provided herein, be subject to this Agreement as substitute property for the Escrowed Shares subject to the Option Notice and shall be invested in an interest bearing account (or other interest bearing instruments or deposits with) of a Canadian chartered bank to be jointly selected by the Purchaser and the Principal or in any other mutually agreed upon investments.

(d)     The Escrowed Proceeds shall be released by the Escrow Agent in accordance with Sections 2.1 and 2.2, *mutatis mutandis* (provided that for the purposes of calculating the Market Value of the Escrowed Shares, the Escrowed Proceeds deposited in lieu of the Escrowed Shares shall be valued at the face value of such proceeds without reference to a 1.2 times multiple where otherwise contemplated hereby).

2.4     **Distribution by Mutual Agreement or Court Order**

Notwithstanding any of the foregoing provisions of this Agreement, the Escrow Agent shall deliver or distribute certificates representing all or any portion of the Escrowed Shares (or the Escrowed Proceeds, as the case may be) in accordance with (i) any written notice executed and delivered by the Vendor, the Purchaser and the Principals or (ii) receipt of a final court order, decree or judgment otherwise ordering or directing a release of the Escrowed Shares (or the Escrowed Proceeds, as the case may be), in accordance with such order, decree or judgment.

**ARTICLE 3**
**Voting Rights and Dividends**

3.1     **Voting Rights or Dividends**

Until such time as the Escrowed Shares are released from escrow, unless the Vendor, Purchaser and Principals otherwise instruct the Escrow Agent in writing:

(i)     All voting rights attached to the Escrowed Shares will at all times be exercised by the registered owner of the Escrowed Shares; and

(ii)     Any dividends received by the Escrow Agent in respect of the Escrowed Shares will be paid or transferred to the Vendor.

## ARTICLE 4
## ESCROW AGENT

4.1     Duties and Liabilities of Escrow Agent

(a)     The Escrow Agent shall have no duties or responsibilities other than those expressly set forth in this Agreement, and no additional implied duties or obligations shall be read into this Agreement against the Escrow Agent. The Escrow Agent shall have no duty to enforce any obligation of any Person, other than as provided herein.

(b)     The Escrow Agent shall not be liable for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith, and in the exercise of its best judgment, and shall not be held liable for any error in judgment made in good faith, unless it shall be proved that the Escrow Agent was negligent in ascertaining the pertinent facts or acted intentionally in bad faith.

(c)     The Escrow Agent may rely, and shall be protected in acting, upon any judgment, order, notice, demand, direction, certificate, or other instrument, paper or document which may be submitted to it in connection with its duties hereunder and the directions incorporated therein and which is believed by the Escrow Agent to be genuine and signed or presented by the proper Person(s), and may accept the same as sufficient evidence of the facts stated therein. The Escrow Agent shall in no way be bound to call for further evidence (whether as to due execution, validity or effectiveness, or the jurisdiction of any court, or as to the truth of any fact), and shall not be responsible for any loss that may be occasioned by its failing to do so.

(d)     In the event that the Escrow Agent shall become involved in any arbitration or litigation relating to the Escrowed Shares or the Escrowed Proceeds, as the case may be, the Escrow Agent is authorized to comply with any decision reached through such arbitration or litigation.

(e)     In the event that a dispute should arise with respect to this Agreement, which results in an adverse claim or demand being made upon the Escrowed Shares or the Escrowed Proceeds, as the case may be, or in the event that the Escrow Agent, in good faith, is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, (i) file an application or motion in interpleader in a court of competent jurisdiction, (ii) refuse to comply with any claims or demands on it, (iii) refuse to take any other action hereunder, so long as such dispute shall continue or such doubt shall exist or (iv) pay into court or otherwise deposit the Escrowed Shares or the Escrowed Proceeds, as the case may be, with a court of competent jurisdiction in the Province of Ontario. Upon the Escrow Agent so depositing the Escrowed

Shares or the Escrowed Proceeds, as the case may be, it shall be discharged and released of its duties and obligations hereunder. The Escrow Agent shall be entitled to continue to refrain from acting until (a) the rights of all the parties have been fully and finally adjudicated by the final order, decree or judgment of a court of competent jurisdiction in the province of Ontario (the time for appeal having expired with no appeal having been taken), or (b) all differences shall have been settled and all doubt resolved by agreement among all of the interested persons, and in each case the Escrow Agent shall have been notified thereof in writing signed by the Parties.

(f)     The parties hereto acknowledge and agree that notwithstanding that Stikeman Elliott LLP is acting as Escrow Agent hereunder, Stikeman Elliott LLP shall be entitled to act or continue to act and shall not be disqualified from acting or continuing to act as legal counsel for the Purchaser or any corporation or corporations forming part of the Purchaser both while it is acting as Escrow Agent hereunder and thereafter.

## 4.2     Escrow Agent's Fees, Expenses and Disbursements

The Purchaser agrees to pay the reasonable fees, expenses and disbursements incurred by the Escrow Agent in connection with the performance of its obligations hereunder. Under no circumstances will the Vendor or any of the Principals be liable to the Escrow Agent in respect of its fees, expenses and disbursements hereunder.

## 4.3     Indemnification of Escrow Agent

The Vendor and the Purchaser will jointly and severally keep the Escrow Agent indemnified at all times against all actions, proceedings, losses, liabilities, costs, claims and demands incurred or sustained by the Escrow Agent in respect of any matter or thing done by it under, pursuant to or in connection with this Agreement, or otherwise arising in connection with its office as Escrow Agent hereunder, except in so far as the same arose through gross negligence or wilful misconduct on the part of the Escrow Agent or otherwise arose from any breach by it of its obligations under this Agreement. Without limiting the generality of the foregoing, the Vendor, the Purchaser and the Principals will indemnify the Escrow Agent against all legal or other fees arising out of or in connection with its entering into this Agreement and carrying out its duties hereunder, including without limitation the costs and expenses of defending itself against any claim of liability or any action for interpleader. This indemnity shall survive the termination or discharge of this Agreement or the resignation of the Escrow Agent.

## 4.4     Resignation, Removal of Escrow Agent

(a)     The Escrow Agent may resign its trust and be discharged from all further duties and liabilities hereunder after giving fifteen days' written notice to the Parties or such shorter notice as the Parties may accept as sufficient, and may be removed from its office as such Escrow Agent by the Parties jointly at any time by not less than five Business Days' written notice given to the Escrow Agent.   Upon discharge or removal, the Escrow Agent shall deliver the

Escrowed Shares or the Escrowed Proceeds, as the case may be, as directed by the Parties.

(b)     In the event of the resignation of the Escrow Agent or its removal from office, the Parties shall appoint a successor escrow agent which shall be either (i) a trust company that carries on business in Canada or (ii) a partnership of barristers and solicitors not having less than 50 members and an office in the City of Toronto.   The Parties acknowledge that the Escrow Agent has indicated its intention to be replaced as escrow agent hereunder shortly following the Closing.

(c)     The Escrow Agent which resigns or is removed shall execute such further assurances or documents as, in the opinion of the Parties, may be necessary or desirable to vest in the new escrow agent the same powers, rights, duties and responsibilities as if the new escrow agent had been originally named as Escrow Agent.

## ARTICLE 5
## MISCELLANEOUS

5.1    Notices

Any notice, direction or other communication to be given under this escrow agreement shall be in writing and given by delivering it or sending it by facsimile or other similar form of recorded communication addressed:

(i)     to the Purchaser at:

2929 California Street
Torrance CA 90503
United States of America

Attention:      Michael M. Umansky
Telephone:     (310) 972-4015
Facsimile:      (310) 943-1630

with a copy (that does not constitute notice) to:

Stikeman Elliott LLP
Barristers & Solicitors
5300 Commerce Court West,
199 Bay Street,
Toronto, ON
M5L 1B9
Canada

- 8 -

Attention:      David Weinberger
Telephone:     (416) 869-5515
Facsimile:     (416) 947-0866

(ii)     to the Vendor at:

c/o Wisebrod/Zeliger Associates
Barristers & Solicitors, Notaries
245 Fairview Mall Drive
Suite 510
Toronto, ON
M2J 4T1

Attention:      Avi Wisebrod
Telephone:     (416) 496-2600 x 201
Facsimile:     (416) 496-1708

(iii)    to the Escrow Agent at:

Stikeman Elliott LLP
Barristers & Solicitors
5300 Commerce Court West,
199 Bay Street,
Toronto, ON
M5L 1B9
Canada

Attention:      David Weinberger
Telephone:     (416) 869-5515
Facsimile:     (416) 947-0866

(iv)     to Gordon Fenwick at:

475 Spadina Road
Toronto, ON
M5P 2W6

(v)      to Paul Fenwick at:

125 Bedford Road
Toronto, ON
M5R 2K6

(vi)     to Joel Fenwick at:

28 Ridge Hill Drive
Toronto, ON
M6G 3A3

(vii)    to Jack Shuster at:

48 King Cross Avenue
Richmond Hill, ON
L4B 2S9

Any such communication shall be deemed to have been validly and effectively given (i) if personally delivered, on the date of such delivery, if such date is a Business Day and such delivery was made prior to 4:00 p.m. (Toronto time), otherwise on the next Business Day, and (ii) if transmitted by facsimile or similar means of recorded communication, on the Business Day following the date of transmission.  Any party may change its address for service from time to time by notice given in accordance with the foregoing, and any subsequent notice shall be sent to such party at its changed address.

5.2    **Entire Agreement**

This Agreement, together with the Purchase Agreement, sets forth the entire agreement among the Parties with respect to the matters contained herein.  In the event of any conflict, the provisions of this Agreement shall prevail.

5.3    **Enurement and Assignment**

This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and assigns.

5.4    **Severability**

If any provision of this Agreement is deemed by any court of competent jurisdiction to be invalid or void, the remaining provisions shall remain in full force and effect.

5.5    **Waiver**

No failure or delay of the Escrow Agent in exercising any right, power or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any right, power or remedy preclude any other or further exercise of any right, power or remedy.

5.6    **Further Assurance**

Each of the Parties shall, at the request of the other Parties, deliver to the requesting party all further documents or other assurances as may reasonably be necessary or desirable to give effect to this Agreement.

5.7    **Time**

Time shall be of the essence in respect of this Agreement.

5.8    **Governing Law**

This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein without reference to any choice of law principles. Each Party irrevocably attorns and submits to the exclusive jurisdiction of the Ontario courts situated in the City of Toronto, and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

5.9     Counterparts

This Agreement may be executed in several counterparts, each of which so executed shall be deemed an original, and all of which shall constitute one and the same instrument.

*[Remainder of page left intentionally blank]*

IN WITNESS WHEREOF the Parties have executed this Escrow Agreement.

FAPL HOLDINGS INC.

By: _____

Name:

Title:


MOTORCAR PARTS OF AMERICA, INC.

By: _____

Name:

Title:


_____
Witness

_____
Witness

_____
Witness

_____
Witness


_____
Joel Fenwick

_____
Jack Shuster

_____
Gordon Fenwick

_____
Paul Fenwick


[Signature page to Escrow Agreement]

IN WITNESS WHEREOF the Parties have executed this Escrow Agreement.

FAPL HOLDINGS INC.

By: _____

       Name:

       Title:


MOTORCAR PARTS OF AMERICA, INC.

By: _____

       Name:

       Title:


_____     _____

Witness                              Joel Fenwick


_____     _____

Witness                              Jack Shuster


_____     _____

Witness                              Gordon Fenwick


_____     _____

Witness                              Paul Fenwick

STIKEMAN ELLIOTT LLP

By: _____
                Authorized Signing Officer

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

MOTORCAR PARTS OF AMERICA, INC., a New York corporation

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

FAPL HOLDINGS, INC., a Canadian corporation, JACK SHUSTER, an individual, GORDEN FENWICK, an individual, PAUL FENWICK, an individual, and JOEL FENWICK, an individual

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Ontario, Canada
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

LOCKE LORD LLP
Michael F. Perlis
300 South Grand Avenue, Suite 2600, Los Angeles, CA  90071
Phone: 213.485.1500 / Fax: 213.485.1200

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ 75,001.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Securities Exchange Act of 1934 [15 U.S.C. §§ 78j and 78t] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].  Defendants misrepresented and concealed material facts in a transaction involving the sale of securities listed on an American stock exchange.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☒ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**     Case Number: _____

CV-71 (11/13)                          CIVIL COVER SHEET                          Page 1 of 3

UNITED STA    DISTRICT COURT, CENTRAL DISTRICT OF    IFORMIA
CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? ☐ Yes ☒ No  If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? ☐ Yes ☒ No  If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?  Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?  Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of the California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

| C.1. Is either of the following true? If so, check the one that applies: | C.2. Is either of the following true? If so, check the one that applies: |
|---|---|
| ☐ 2 or more answers in Column C  ☐ only 1 answer in Column C and no answers in Column D  Your case will initially be assigned to the SOUTHERN DIVISION. Enter "Southern" in response to Question D, below.  If none applies, answer question C2 to the right. ➡ | ☐ 2 or more answers in Column D  ☐ only 1 answer in Column D and no answers in Column C  Your case will initially be assigned to the EASTERN DIVISION. Enter "Eastern" in response to Question D, below.  If none applies, go to the box below. ⬇ |

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | A |

CV-71 (11/13)                CIVIL COVER SHEET                Page 2 of 3

American LegalNet, Inc.
www.FormsWorkFlow.com

UNITED STA  DISTRICT COURT, CENTRAL DISTRICT OF  IFORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO   ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO   ☐ YES

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):**          DATE: February 13, 2014

F. Phillip Hosp

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

American LegalNet, Inc.
www.FormsWorkFlow.com