LOCKE LORD LLP
MICHAEL F. PERLIS (095992)
mperlis@lockelord.com
CARY J. ECONOMOU (211438)
ceconomou@lockelord.com
F. PHILLIP HOSP (265225)
phosp@lockelord.com
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071
Telephone: 213-485-1500
Facsimile: 213-485-1200

Attorneys for Plaintiff
MOTORCAR PARTS OF AMERICA, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOTORCAR PARTS OF AMERICA, INC., <br><br> Plaintiff, <br><br> vs. <br><br> FAPL HOLDINGS INC., <br><br> Defendants. | CASE NO. CV14-01153 <br><br> **DECLARATION OF SELWYN JOFFE IN SUPPORT OF MOTORCAR PARTS OF AMERICA, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND** *FORUM NON CONVENIENS* <br><br> Hearing Date: June 19, 2014 <br> Time: 8:30 a.m. <br> Courtroom: 10 <br> Judge: Hon. George H. Wu <br><br> Complaint Filed: February 13, 2014 <br> Trial Date: N/A |

# DECLARATION OF SELWYN JOFFE

I, Selwyn Joffe, declare as follows:

1. I am Chairman, President, and Chief Executive Officer of plaintiff Motorcar Parts of America, Inc. ("MPA"). I have personal knowledge of the matters set forth herein, and if called to testify, I could and would competently testify as to the truth of those matters.

2. MPA is a New York corporation with its principal place of business located in Los Angeles County at 2929 California Street, Torrance, California 90503. My office is located at MPA's headquarters in Torrance. At all relevant times, shares of MPA's common stock were listed on the Nasdaq Stock Market and publicly traded under the ticker symbol "MPAA."

3. MPA is in the business of manufacturing, remanufacturing, and distributing aftermarket automobile parts.

4. MPA's headquarters facility in Torrance serves as the hub of MPA's operations—with approximately 200,000 square-feet dedicated to manufacturing and remanufacturing, shipping and receiving, warehousing, testing labs, inspection, packaging, and engineering.

5. MPA's management team and corporate officers are located in Torrance.

6. The specific operations and functions that are managed out of MPA's Torrance headquarters includes information systems, operations, human resources, all business development efforts, project coordination responsibilities, sales, customer service, corporate administration, significantly all accounting functions, all legal matters, and all SEC and Nasdaq compliance matters.

7. The board of directors' and shareholders' meetings occur in Torrance.

## August 2010 Debenture

8. In 2009, Fenwick Automotive Products, Ltd. ("Fenwick") and its affiliates (collectively, "Fenco") started to experience liquidity issues that caused Fenco to run afoul of various financial covenants in its loan agreement with its lender.

Although I had known Gordon Fenwick for several years and discussed synergies between our respective businesses, the first serious discussion leading up to MPA's investment and ultimate acquisition of Fenco did not occur until June 2010, when Jack Shuster came to meet me in Los Angeles.

9. At the meeting, Jack discussed Fenco's liquidity issue and proposed a partnership between Fenco and MPA whereby MPA would provide capital in exchange for an option to purchase part of Fenco. I told Jack that MPA may be interested in such a proposal if Fenco showed me and my management team why such an investment would be beneficial to MPA.

10. On or about June 23, 2010, Jack returned to Torrance with Gordon Fenwick. At the meeting, Jack and Gordon gave a presentation discussing Fenco's products and market share, its business strategy, and a financial summary. In connection with the financial summary, Jack and Gordon represented that Fenco's top U.S. customers accounted for almost seventy percent of its total sales. They also provided financial statements indicating that the company's projected earnings before interest, taxes, depreciation, and amortization (EBITDA) was approximately $24 million. They further represented that these projections were accurate.

11. In advance of the June 23 meeting, I received the documents described in paragraph 10 in an email from Fenco's CFO, Gino Trigiani.  Attached hereto as **Exhibit A** is a true and correct copy of that email (with all attachments). It is dated June 22, 2010 and entitled "Fenwick Financial Information."

12. Based on the information contained in Jack and Gordon's presentation, I expressed an interest in continuing our discussions about a strategic partnership with Fenco. Although Fenco had a shortage of cash, the financial statements presented to me indicated that the company was profitable. Strategically, MPA's interest in Fenco had nothing to do with Canada. At the time, almost all of Fenco's revenue generating activity occurred outside of Canada. A vast majority of its customers were based in the U.S. and all of its manufacturing and distribution facilities were in the U.S. and

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Mexico. Generally speaking, MPA believed that Fenco's business could be beneficial in two ways: (1) Fenco's existing product line would enable MPA to expand beyond its alternator and starter business; and (2) MPA's pre-existing manufacturing expertise and efficient distribution channels in the U.S. and Mexico provided an opportunity to save costs and remedy Fenco's cash flow issues.

13. Following my meeting with Jack and Gordon, I advised them that MPA's management team in Torrance would need additional information to assess the risks of the proposed loan. During our conversations, I made it clear that my management team in Torrance would be assessing the risk associated with any loan. At all times, Gordon Fenwick, Joel Fenwick, Paul Fenwick, and Jack Shuster (collectively, "Principals") were aware that MPA had reporting obligations under federal securities laws and that financial statements provided by Fenco would be filed with the SEC. MPA also asked Ernst & Young in Los Angeles for assistance.

14. In August 2010, after receiving board authorization in Torrance, MPA entered into an agreement to loan Fenco $1,894,034.09, in which FAPL warranted that the "audited consolidated financial statements of [FAPL] and notes thereto as at and for the year ended March 31, 2009 present fairly in all material respects the consolidated financial position of [Fenwick]." MPA relied on this warranty, among others, in deciding to make the initial investment in Fenco.

## December 2010 Amended Debenture

15. After MPA's initial investment, the Principals returned to Los Angeles again in September 2010 to discuss the possibility of MPA providing additional loans. Even after the first loan, Fenco still needed capital and the Principals were very eager to receive additional funds from MPA.

16. In November 2010, MPA was informed that Fenco had obtained a new senior secured credit facility with M&T Bank ("M&T") to replace the prior facility provided by Royal Bank of Canada. A true and correct copy of MPA's press release is attached hereto as **Exhibit B**.

3
DECLARATION OF SELWYN JOFFE

17. After M&T agreed to provide Fenco with a revolving credit facility, MPA's board authorized an additional loan to Fenco in the amount of approximately $2,969,000 ("Amended Debenture"), bringing the total aggregate loan amount to approximately $4,863,000. In making this loan, MPA relied on the financial information provided by Fenco. MPA was also assured by the fact that M&T had recently agreed to provide Fenco with a $50 million line of credit.

### May 2011 Acquisition

18. After the Amended Debenture and leading up to the May 2011 acquisition, Fenco provided daily and weekly financial reports to MPA's corporate staff in Torrance. Such communications occurred on a daily basis up until days before the acquisition. In addition to these discussions, the Principals travelled to Los Angeles for several days in January 2011 to lead a joint OGSM (Objectives / Goals / Strategies / Measures) strategic planning conference and to discuss an overall integration strategy.

19. In the months that followed, MPA's legal counsel in Canada and the U.S. drafted and negotiated the terms of the Purchase Agreement, Escrow Agreement, and Hold Agreement.

20. According to my recollection, on March 1, 2011, Jack Shuster and Gino Trigiani met with Michael Umansky (MPA General Counsel), David Lee (MPA Chief Financial Officer), me, and representatives from M&T at MPA's headquarters in Torrance to discuss various topics identified in an email attached as Exhibit F to the Declaration of David Lee.

21. On May 6, 2011, after receiving authorization from the board of directors, I executed the Purchase Agreement and acquired Fenco in exchange for 360,000 shares of its common stock. Before this time, I had travelled to Ontario, Canada on several occasions to meet with the Principals. According to my recollection, we discussed Fenco's financials at some of these meetings, not all. However, no investment decisions were made during any of these visits.

22. Based on my past dealings with the Principals, it is my understanding that they traveled quite frequently to the U.S. and other countries. For example, while he was employed at Fenco, Gordon Fenwick managed the sales department. Part of his job was to visit Fenco's U.S. based customers and attend trade shows in the U.S. Jack Shuster also owned a second home in Florida that he visited frequently.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2014 at Boston, Massachusetts.

_____
Selwyn Joffe