LOCKE LORD LLP
MICHAEL F. PERLIS (095992)
mperlis@lockelord.com
CARY J. ECONOMOU (211438)
ceconomou@lockelord.com
F. PHILLIP HOSP (265225)
phosp@lockelord.com
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071
Telephone: 213-485-1500
Facsimile: 213-485-1200

Attorneys for Plaintiff
MOTORCAR PARTS OF AMERICA, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOTORCAR PARTS OF AMERICA, INC., <br><br> Plaintiff, <br><br> vs. <br><br> FAPL HOLDINGS INC., et al., <br><br> Defendants. | CASE NO. 2:14-cv-01153-GW-JEM <br><br> Honorable George H. Wu <br><br> **MOTORCAR PARTS OF AMERICA, INC.'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** <br><br> [Pursuant to August 8, 2014 Order Re Supplemental Briefing, Dkt. 37] <br><br> Complaint Filed: February 13, 2014 <br> Trial Date: N/A |

# **TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................. 1

II. ARGUMENT .........................................................................................................2

    A. Utilizing Instrumentalities of the U.S. Capital Markets. ...........................2

    B. Derivative Liability Under § 20(a) of the Exchange Act...........................5

    C. Continuous and Systematic Business Contacts with the U.S. ...................7

    D. Paul and Joel Purposefully Directed Conduct to California That Had A Foreseeable Effect of Causing Injury in California. ................................ 10

III. CONCLUSION ................................................................................................... 12

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bristol-Myers Squibb Co. v. Superior Court*,
   No. A140035, 2014 WL 3747250 (Cal. Ct. App. July 30, 2014) ...................... 7, 8

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999) ........................................................................... 7

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................................... 6

*Flood v. Miller*,
   35 Fed. App'x. 701 (9th Cir. 2002) .................................................................. 6

*Howard v. Everex Systems, Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ......................................................................... 3

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ........................................................................................ 8

*In re LDK Solar Securities Litigation*,
   No. C-07-05182-WHA, 2008 WL 4369987 (N.D. Cal. Sept. 24, 2008) ............... 3

*In re Mutual Funds Investment Litigation*,
   566 F.3d 111 (4th Cir. 2009) ........................................................................... 6

*Kairalla v. Advanced Medical Optics, Inc.*,
   No. CV 07-05569 SJO, 2008 WL 2879087 (C.D. Cal. 2008) ...................... 3, 6

*Pennoyer v. Neff*,
   95 U.S. 714 (1877) .......................................................................................... 8

*S.E.C. v. Dunn*,
   587 F. Supp. 2d 486 (S.D.N.Y. 2008) ............................................................. 2

*S.E.C. v. Ficeto*,
   No. CV 11-1637-GHK, 2013 WL 1196356 (C.D. Cal. Feb. 7, 2013) ................ 2

*San Mateo Cnty. Transit Dist. v. Dearman, Fitzgerald & Roberts, Inc.*,
   979 F.2d 1356 (9th Cir. 1992) ......................................................................... 6

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

*Sec. Investor Prot. Corp. v. Vigman*,
  764 F.2d 1309 (9th Cir. 1985) .................................................................................. 2

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
  768 F.2d 1001 (9th Cir. 1985) .................................................................................. 7

*Walden v. Fiore*,
  — U.S. —, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014) ........................................... 2

**FEDERAL STATUTES**

Section 10(b) of the Exchange Act

  [15 U.S.C. § 78j(b)] ............................................................................................ 1, 6

Section 20(a) of the Exchange Act

  [15 U.S.C. § 77o] ......................................................................................... 1, 2, 5, 6

Section 27 of the Exchange Act

  [15 U.S.C. § 78aa] ..................................................................................................... 2

**FEDERAL REGULATIONS**

S.E.C. Rule 10b-5

  [17 C.F.R. § 240.10b-5] ............................................................................................ 1

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 8 ............................................................................................................. 6

Fed. R. Civ. P. 9 ............................................................................................................. 6

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

## I. INTRODUCTION

Pursuant to the Court's order, Motorcar Parts of America, Inc. ("MPA") hereby addresses the allegations and evidence demonstrating Paul Fenwick and Joel Fenwick's ("Paul and Joel") contacts with the U.S. and the substantial connection that those contacts have with the federal securities claims asserted in this action.

- **Exploiting U.S. Capital Markets:** When a defendant is not present in a forum, district courts can assert personal jurisdiction when a defendant utilizes instrumentalities of the U.S. capital markets to perpetuate a fraud. In this case, Paul and Joel availed themselves of the instrumentalities of a national exchange – i.e., the NASDAQ. They warranted that certain financial statements provided by FAPL Holdings Inc. ("FAPL") to MPA were accurate by signing the Purchase Agreement. They understood that FAPL's financial statements would be consolidated with MPA's financial statements and that the consolidated financial statements would be filed with the SEC in accordance with federal securities regulations and disseminated to U.S. investors. Consequently, Paul and Joel knew that, to the extent FAPL's financial statements were false, MPA's statements would also be false and would result in false information being injected into the market.

- **Personal Jurisdiction Over Control Persons:** Section 20(a) of the Exchange Act of 1934 ("Exchange Act") imposes liability on persons who control a company that violates federal securities laws. In this case, Paul and Joel controlled FAPL, a primary violator of § 10(b) and Rule 10b-5. MPA has alleged that they exercised day-to-day control over the company and were able to influence its decisions such that they could have corrected misrepresentations contained in the financial statements. These allegations are more than sufficient to establish jurisdiction. The Ninth Circuit has held that the plaintiff only needs to make a "non-frivolous allegation" that the defendant controlled a company liable for fraud.

- **Continuous and Systematic Business Contacts With the U.S.:** Paul and Joel's systematic and continuous business contacts with the U.S. also provide a

SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

basis for specific personal jurisdiction. Collectively, they both owned half of FAPL and were part of the "senior management team" who decided to move Fenco's manufacturing operations to the U.S. They were also responsible for managing Fenco's operations in the U.S. and the irregular business practices that occurred under their management directly relate to MPA's federal securities claims – e.g., underreported cores, undisclosed customer agreements, underreported inventory, and low fill rates. Thus, it is entirely proper for the Court to conclude that MPA's securities fraud claims "arise out of" Paul and Joel's contacts with the U.S. They are far from the "random, fortuitous, and attenuated" contacts discussed in *Walden v. Fiore*, — U.S. —, 134 S. Ct. 1115, 1123, 188 L. Ed. 2d 12 (2014).

- **Meetings With MPA During Due Diligence Period:** Paul and Joel were actively involved in the due diligence process. They admit that they attended strategy meetings with MPA in California. The evidence also shows that they led "combined MPA/Fenco group meetings" relating to Fenco's operations, which was the epicenter for the irregular business practices at issue in this case. MPA acknowledges that the Court is reluctant to reconsider its initial analysis. However, the meetings with MPA are still relevant to decide personal jurisdiction because the Court's analysis in the securities context involves Paul and Joel's contacts with the U.S. as a whole.

## II. ARGUMENT

Under § 27 of the Exchange Act, personal jurisdiction exists so long as a defendant has minimum contacts with the United States. *Sec. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[M]inimum contacts may be established either by purposeful direction or purposeful availment." *S.E.C. v. Ficeto*, No. CV 11-1637-GHK, 2013 WL 1196356, at *4 (C.D. Cal. Feb. 7, 2013).

### A. Utilizing Instrumentalities of the U.S. Capital Markets.

Even though a defendant is not present in a forum, minimum contacts will exist if the defendant utilizes the instrumentalities of U.S. capital markets. *See, e.g., S.E.C. v. Dunn*, 587 F. Supp. 2d 486, 509-10 (S.D.N.Y. 2008) (jurisdiction over officer of

Canadian subsidiary who prepared false financial data for inclusion in financial statements of public company); *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1068 (9th Cir. 2000) ("defendant who is alleged to have knowingly traded on an American exchange on the basis of inside information has purposefully availed himself of the instrumentalities of United States commerce and can reasonably expect to be haled into an American court"); *In re LDK Solar Securities Litigation*, No. C-07-05182-WHA, 2008 WL 4369987 at *6 (N.D. Cal. Sept. 24, 2008) (officers who had control over company that made misleading statements in prospectus concerning its inventory); *Kairalla v. Advanced Medical Optics,* Inc., No. CV 07-05569 SJO, 2008 WL 2879087, *15 (C.D. Cal. 2008) (sufficient where plaintiff alleged that German defendant "trades in the United States securities markets, purposefully availing himself of the protections and privileges of the United States, and that [defendant] has conducted business with ... executive offices in Santa Ana, California.").

In this case, Paul and Joel purposefully availed themselves of the instrumentalities of a national exchange – i.e., the NASDAQ. On May 6, 2011, they executed the Purchase Agreement and sold Fenco to MPA in exchange for 360,000 shares of MPA's common stock. (Compl. ¶ 29.) At the time, the shares represented approximately 3% of MPA's outstanding common stock and, through their ownership of FAPL, Paul and Joel received all voting and dividend rights of an MPA shareholder. (Hosp Decl., Ex. V ("12,438,271 shares of common stock outstanding as of June 6, 2011"); Compl., Ex. C § 3.1 (voting and dividends).)

In entering into the transaction, Paul and Joel knew that the shares were subject to the U.S. regulatory scheme and could reasonably expect to be haled into an American court. The Purchase Agreement stated that MPA's common stock "is the class of securities of the Purchaser listed on the NASDAQ Global Market as of the date of this Agreement." (Compl. ¶ 11.) Paul and Joel also received the right to sell up to 90,000 shares "over the facilities of the NASDAQ" after the eighteen month escrow

3
SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

period, which they have done.[1] (*Id.*, Ex. C § 2.3 (option sale); Hosp Decl., Ex. O at 251-54 (unrestricted stock certificate).) Moreover, the Hold Agreement executed in conjunction with the acquisition stated that the shares were subject to transfer restrictions as required by federal securities laws and required FAPL, which could only act through its owners, to enter into any transaction as MPA may require to bring the shares into compliance with federal securities laws. (Compl., Ex. B at 1.) The Hold Agreement further stated that any transfer of the shares would "be governed by and construed in accordance with the laws of the State of New York." (*Id.* at 5.)

In acquiring Fenco, Paul and Joel knew that MPA would be relying on the consolidated financial statements of FAPL and the notes thereto for the fiscal year ended on March 31, 2010, and the consolidated financial statements of FAPL for the nine-month period ended on December 31, 2010. (Compl. ¶ 30.) They warrantied that those financial statements were accurate by signing the Purchase Agreement. (*Id.* ¶¶ 31-35.) Echoing the language of § 10(b), § 5(x) of the Purchase Agreement stated "None of the statements, documents, certificates, or other items prepared or supplied by [FAPL] or the Subsidiaries to the Purchaser … contains any untrue statement of a material fact, or failed to disclose a fact that was necessary to be made in order for any material statement not to be misleading at the time it was provided." (*Id.* ¶ 35.)

When they signed the Purchase Agreement, Paul and Joel knew that MPA had reporting obligations under federal securities laws and they understood that FAPL's financial statements would be consolidated with MPA's financial statements and that the consolidated financial statements would be filed with the SEC in accordance with federal securities regulations and disseminated to U.S. investors. (Joffe Decl. ¶ 13; Compl. ¶¶ 12, 44.) Consequently, they knew that, to the extent FAPL's financial statements were false, MPA's statements would also be false and would result in false

---

[1] Paul and Joel's sale of the escrowed shares could not be referenced in the Complaint or MPA's Opposition because it occurred after those documents were filed. If the Court deems it necessary, MPA requests an opportunity to amend the Complaint.

4

SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

information being injected into the market place. (*Id.*) The Purchase Agreement and financial statements were also subsequently filed with the SEC as an attachment to MPA's July 22, 2011 Form 8-K/A. (Compl. ¶ 38.)

The Complaint alleges that Paul and Joel knew that the financial statements were false and that they had the ability to influence the content of the financial statements when they were provided to MPA. (Compl. ¶¶ 46, 49, 55, 77, 89.) More specifically, the Complaint alleges that Gordon Fenwick *advised all the principals* that "we are losing $5MM per month in Sales Revenue due to Fill Rate issues." (*Id.* ¶ 55.) In addition, the auditor's report for March 31, 2010 financial statements states "these financial statements are the responsibility of the companies' management." (Hosp Decl., Ex. N at 223.) It also states, "[t]he preparation of these financial statements … requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting periods." (*Id.* at 237.)

Following the acquisition, MPA's transfer agent in New York issued the shares to FAPL. (Shuster Decl., Ex. 13.) Pursuant to § 2.3 of the Escrow Agreement, Paul, Joel and their codefendants subsequently instructed the transfer agent to remove the restrictive legend so that they could sell the shares over the facilities of the NASDAQ. (Hosp Decl. ¶ 11, Ex. O.) After receiving an opinion letter from MPA's securities counsel in New York, the transfer agent removed the legend and issued an unrestricted stock certificate. (*Id.*) Paul and Joel, along with their codefendants, then sold the shares and deposited the proceeds in an escrow account. (*See id.*)

### B. Derivative Liability Under § 20(a) of the Exchange Act.

In conjunction with its securities fraud claim, MPA has asserted a derivative liability claim under § 20(a) of the Exchange Act. (Compl. ¶¶ 88-92.) A person exercises "power or control" within the meaning of § 20(a) if the person is able "directly or indirectly, to exert influence on the policy and decision-making process

5
SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

of" a primary violator of the securities laws. *Flood v. Miller*, 35 Fed. App'x. 701, 703 (9th Cir. 2002) ("An allegation of controlling person liability under § 20(a) requires a showing that an individual defendant had the power to control or influence [a primary violator].") In the Complaint, MPA has alleged that Paul and Joel exercised control over the day-to-day operations of FAPL. (*Id.* ¶¶ 8, 9, 82, 83, 89-91.) MPA has also alleged that they had the power to influence and control—and did influence and control—the decision making of Fenco, including the content and dissemination of the false statements at issue in this case. (*Id.* ¶¶ 89, 90.)

Paul and Joel do not dispute the fact that they were control persons. They argue only that the fifth cause of action should be dismissed because they claim that there is no violation of § 10(b), and consequently, there can be no control person liability under § 20(a) for the individual defendants. (Mot. to Dismiss (Dkt. 15-1) at 16-17.) That argument is irrelevant to the jurisdiction issue.

Section 20(a) makes a control person jointly and severally liable for securities violations along with the person controlled. 15 U.S.C. § 77o. The purpose of this provision is to prevent people from using straw parties or subsidiaries to act in their place and to perform acts that violate federal securities laws. *In re Mutual Funds Investment Litigation*, 566 F.3d 111, 130 (4th Cir. 2009). For personal jurisdiction, federal securities laws "[do] not require that a plaintiff demonstrate that a defendant is liable in order to obtain jurisdiction of him under this statute…. If the suit is to enforce a liability created by the Securities Act, the court has jurisdiction of the defendant wherever he may be found." *San Mateo Cnty. Transit Dist. v. Dearman, Fitzgerald & Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir. 1992). Therefore, jurisdiction exists as long as "***plaintiff makes a non-frivolous allegation that the defendant controlled a person liable for the fraud.***" *Id.*; *Kairalla*, 2008 WL 2879087, at *15 (jurisdiction existed over a German citizen who exercised a significant degree of day-to-day control over a corporation that conducted business within the forum.). Furthermore, the relevant pleading standard for a claim under § 20(a) is governed by Rule 8, not

Rule 9(b). *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1201 (C.D. Cal. 2008) (quoting *LDK Solar*, 2008 WL 4369987, at *12); *see also Paracor Finance Inc., v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) ("[P]laintiff need not show the controlling person's scienter or that they 'culpably participated' in the alleged wrongdoings.")

### C.  Continuous and Systematic Business Contacts with the U.S.

Personal jurisdiction also exists because Paul and Joel purposefully availed themselves of the protections and benefits of doing business in the U.S. For specific jurisdiction, "the defendant's forum activities need not be directed at the plaintiff in order to give rise to specific jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court*, No. A140035, 2014 WL 3747250, at *14 (Cal. Ct. App. July 30, 2014) (quoting *Vons Companies, Inc. v. Seabest Foods, Inc.*, 14 Cal. 4th 434, 457 (1996)). It is sufficient to demonstrate that the defendant "deliberately exploited" the relevant market of the forum. *Id.* at 16. Furthermore, the corporate form may be ignored when the allegations or evidence demonstrates that a corporate officer or director authorizes, directs or participates in the tortious conduct. *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985).

In this case, Fenco's fraudulent accounting and irregular business activities arose from a desperate need to raise money. (Compl. ¶ 25.) MPA has alleged that Paul and Joel were controlling principals of FAPL, acting as directors and officers of the company. (*Id.* ¶¶ 8,9.) Each of them owned 25% of Fenco and, as part of the "senior management team," they were personally involved in the "ongoing and judicious reviews of investment opportunities, including capital expenditures and acquisitions." (Hosp Decl., Ex. G at 167-68.) In 2005, they determined that Fenco "could no longer survive as a Canadian manufacturing company" and decided to relocate the company's manufacturing and distribution operations to the U.S. and Mexico. (*Id.* at 166.) In this respect, they concluded that U.S. manufacturing was "advantageous" because of the "skilled labor force and modern assembly lines." (*Id.* at 173.)

Paul and Joel argue that they are not subject to the power of the Court because their improper conduct occurred in Canada. (*See, e.g.,* Defs. Mot. to Dismiss (Dkt. 14-1) at 14.) Certainly, there is no support for their claim that, in effect, they can submit false financial statements from Canada with the knowledge that they will be filed with the SEC and still escape jurisdiction of U.S. courts. This is not only illogical, but against precedent. For at least the last sixty years, courts have rejected assertions that jurisdiction depends on whether conduct occurred within the geographic boundaries of the relevant forum. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945) ("[D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it.").

Paul and Joel's argument also focuses on the parties' negotiations and events surrounding the closing date. That argument, however, ignores the full extent of the personal jurisdiction analysis. All of their U.S. contacts are relevant provided that there is a sufficient nexus or connection with MPA's claims. *See Bristol-Myers Squibb Co.*, 2014 WL 3747250, at *13 (analyzing the relatedness standard). In this case, there is. Paul and Joel were directly involved in the management of Fenco's U.S. operations and the irregular business practices that occurred on their watch were directly related to warranties in the Purchase Agreement and the misrepresentations alleged by MPA: (i) the extent of Fenco's outstanding core liabilities, (ii) the terms of side agreements with major customers and suppliers, (iii) inventory and payable amounts owed to vendors for pre-acquisition financial transactions, and (iv) inaccurate revenue forecasts using inflated filled rates. (Compl. ¶¶ 31-35, 83.)

As vice president of manufacturing and facilities, Paul was responsible for Fenco's manufacturing operations and facilities for Fenco's U.S. subsidiaries. (Joffe Decl., Ex. A at 32 (organizational chart with entities), 35-40 (facilities overview); Hosp Decl., Ex. G at 180 (management overview); Paul Fenwick Decl. ¶ 4.) This included:

- **LH Distribution (Lock Haven, PA)** – 130,000 square foot facility, approximately 100 employees, and responsible for receiving and sorting of used cores. (Selwyn Decl., Ex. A at 27, 35, 38; Hosp Decl., Ex. G at 175.)

- **Flo-Pro (Bedford, NH)** – 154,000 square foot facility, approximately 150 employees, and responsible for remanufacturing and direct distribution of CV shafts and receiving and sorting CV shaft cores. (Selwyn Decl., Ex. A at 27, 35, 38, 40; Hosp Decl., Ex. G at 172, 173, 175.)

- **Rafko (Watsonville, PA)** – 335,000 square foot facility, approximately 140 employees, and responsible for new packaging and distribution. (Joffe Decl., Ex. A at 27, 32, 35-40; Hosp Decl., Ex. G at 165, 167, 171.73.)

In overseeing these entities, Paul had intimate knowledge of material facts that he did not disclose to MPA. In October 2010, Gordon sent an email to him stating, "I stand behind my statement made *at the management meeting* 3 weeks ago, where I stated we are losing $5MM per month in Sales Revenue due to Fill Rate issues." (Compl. ¶ 55.) Additionally, despite the warranty in the Purchase Agreement relating to undisclosed contracts, Compl. ¶ 32, Paul knew about undisclosed supplier arrangements. For example, he knew about an off the books agreement with Lap Co., a California based supplier, to obtain cores that Fenco needed to fill orders for Advance Auto Parts. (Hosp Decl., Ex. J at 203; Lee Decl. ¶ 9.)

As vice president of procurement and product development, Joel was responsible for sourcing cores, raw materials and new products from suppliers. (Joffe Decl., Ex. A at 32 (organizational chart), 35-40 (facilities overview); Hosp Decl., Ex. G at 172 (core procurement), 180 (management overview); Joel Fenwick Decl. ¶ 4.) "Historically, cores and raw materials [were] sourced domestically so their lead times tend to be much shorter." (Ex. G at 190.) More specifically, David Lee stated "All three of [Fenco's] top "core" suppliers and two of its raw material suppliers were based in the U.S." (Lee Decl. ¶ 9.) He also noted that Fenco procured materials from additional California based suppliers including A-1 Automotive Core Supplier

Company, Inc., Lap Co., WJB Automotive Inc., and The Recycler Core Company, Inc." In addition to his contacts with suppliers, *Joel also met with customers in the U.S. to develop business.* (Ex. U at 293 (meeting with Napa in Atlanta, GA).)

Joel knew material facts relating to Fenco's financial condition that were not disclosed in his meetings with MPA. As with Paul, the evidence demonstrates that he knew Fenco was losing $5 million a month due to fill rates. (Compl. ¶ 55.) It is now clear that those issues were not isolated. In a subsequent email relating to Advance Auto's lost sales report, Joel advised Gordon to "*stop smoking crack*" and elaborated:

> "[W]e have no money to pay for cores- and the suppliers of New units won't ship us. We paid vendors a million a week the last 4 weeks. Need 4 million per week!! *We have been on our financial death bed for months.* Our buyers have their hands tied…. Sales and Purchasing take all the heat for our mess."

(Hosp Decl., Ex. Q at 256.) Therefore, it is apparent that Paul and Joel had continuous contacts with the U.S. that were directly related to MPA's claims.

### D. Paul and Joel Purposefully Directed Conduct to California That Had A Foreseeable Effect of Causing Injury in California.

In conjunction with their efforts to avail themselves of the U.S. markets, Paul and Joel also intentionally directed conduct towards MPA's management in California. Although they did not attend the initial meeting with Jack and Gordon, the financial statements presented at the meeting were prepared using estimates and assumptions provided by them, i.e., Fenco's management. (Joffe Decl., Ex. A at 107.) The summaries of accounting policies also stated that the owners of the company unanimously consented to prepare the financial statements using differential reporting options available to non-publicly accountable enterprises. (*Id.* at 111.)

Paul and Joel cannot (and do not) claim that they were not fully apprised of the initial discussions with MPA. Collectively, they owned half of the company and had a significant financial interest in its viability. (Hosp Decl., Ex. G at 167-68.) Furthermore, as part of Fenco's "senior management team," they were personally

10
SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

involved in the "ongoing and judicious reviews of investment opportunities, including capital expenditures and acquisitions." (*Id.*) That is why they knew that MPA's first investment was not enough and travelled to California for an "IMPORTANT MEETING!!!," Ex. I at 202, to "discuss the possibility of MPA providing additional loans," Joffe Decl. ¶ 15. Despite Fenco's calamitous financial situation, Paul and Joel stayed silent and did not fulfill their obligation to correct the misleading picture painted by the 2009 Financial Statements. (Compl. ¶¶ 48-55.) Instead, they doubled down and stood by as FAPL warranted the financial statements a second time to secure an even larger investment in December 2010. (Joffe Decl. ¶ 17.) At that point, they knew that Fenco was losing $5 million a week and had forecasted future revenue using fictitious fill rates. (*See* Compl. ¶ 55.) They also knew that MPA had reporting obligations under federal securities laws and would be disclosing the financial statements to the investing public. (Joffe Decl. ¶ 13.)

The big challenge after MPA's second investment was to keep up appearances long enough to make it through the due diligence period. This required a group effort. In January 2011, Paul and Joel returned to California for a multi-day meeting, during which the top-level executives from both companies carefully explored the potential synergies in integrating the two companies. (Lee Decl. ¶ 10, Ex. E; J. Fenwick Decl. (Dkt. 14-4) ¶ 7; P. Fenwick Decl. (Dkt. 14-5) ¶ 7.) At those meetings, Paul and Joel were certainly not passive participants. To the contrary, they were designated to lead the operations and manufacturing group. (Ex. E at 140 (identifying person in charge as "Ops/Mfg – Steve/Doug; Fenco (Ray B.**/Paul F./Joel F.**)").) And, indeed, MPA's understanding of Fenco's operations and manufacturing was one of the primary incentives for it to acquire the company. (*See* Joffe Decl. ¶ 12; Shuster Decl. ¶ 9.)

Leading up to the conference, Paul and Joel also conducted conference calls with their MPA counterparts in so-called "combined MPA/Fenco group meetings" to develop a joint strategy centered on the strengths and weaknesses of each company. (Ex. E at 139-40.) Among other things, this included a goal to "Maximize

1  MPA/FENCO core supply synergies" by identifying core suppliers, leveraging terms, freight and pricing, and exploring volume rebates or payment discount. (Ex. E at 143.) At no point, did Paul or Joel disclose the substantial irregularities with their core receiving process, the fact that it was indebted with U.S. core suppliers, or the fact that Fenco was on its "financial deathbed." (Compl. ¶¶ 48-55.)

The fraud continued even after MPA acquired Fenco. (*Id.* ¶ 44.) Paul and Joel were entrusted with the responsibility of managing Fenco for MPA. (*Id.* ¶ 39.) In managing Fenco, they reported to MPA's management in California and had duties that were "assigned from time to time by the MPA Board, its compensation committee or the Chief Executive Officer of MPA, generally applicable to its operations in North America and Mexico." (J. Fenwick Decl. (Dkt. 14-4), Ex 1 § 4; P. Fenwick Decl. (Dkt. 14-5), Ex 1 § 4.) Certainly, a fiduciary relationship with a company based in California must be considered to be a "United States-based relationship" when the fiduciaries report to executives in the U.S.

## III.  CONCLUSION

For the foregoing reasons, the allegations and evidence in this case are sufficient for the Court to exercise personal jurisdiction over Paul and Joel. Taken collectively, Paul and Joel's contacts with the U.S. are not only numerous, but substantially related to MPA's securities fraud claims. As a result, their Motion to Dismiss should be denied.

Dated:  August 18, 2014                    LOCKE LORD LLP


                                           By: /s/ Michael F. Perlis
                                               Michael F. Perlis (095992)
                                               Cary J. Economou (211438)
                                               F. Phillip Hosp (265225)

                                           Attorneys for Plaintiff
                                           MOTORCAR PARTS OF AMERICA, INC.

12
SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS